# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| Sorenson Communications, LLC ) | |
| ) | |
| Petitioner, ) | |
| ) | Case No. ___19-1145___ |
| v. ) | |
| ) | |
| FEDERAL COMMUNICATIONS ) | |
| COMMISSION and ) | |
| THE UNITED STATES ) | |
| OF AMERICA ) | |
| ) | |
| Respondents. ) | |
| _____) | |

## PETITION FOR REVIEW

Pursuant to 47 U.S.C. § 402(a), 28 U.S.C. §§ 2342 and 2344, and Rule 15(a) of the Federal Rules of Appellate Procedure, Sorenson Communications, LLC files this Petition for Review of the following order of the Federal Communications Commission ("FCC"), which (among other things) established rules regarding non-service related incentives for customers of Video Relay Service ("VRS") and adopted numerous new rules governing the provision of Telecommunications Relay Service ("TRS"):

*Structure and Practices of the Video Relay Service Program; Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, Report and Order and Further Notice of Proposed Rulemaking, FCC 19-39, CG Docket Nos. 10-51 and 03-123 (rel. May 15, 2019) ("the *Order*").

A copy of the *Order* is attached to this Petition.

The *Order* was released on May 15, 2019, and was published in the Federal Register on June 6, 2019, at 84 Fed. Reg. 26364.  This Petition is therefore timely.  *See* 28 U.S.C. § 2344.  Venue is proper under 28 U.S.C. § 2343.

Sorenson seeks relief from certain portions of the *Order* on the grounds that the *Order* exceeds the FCC's jurisdiction and authority; violates the Administrative Procedure Act; is arbitrary, capricious, and an abuse of discretion; and is otherwise contrary to the law.  Sorenson asks that this Court set aside the Commission's decision as unlawful and grant appropriate relief.

Respectfully Submitted,

/s/ Mark D. Davis

_____

Christopher J. Wright
John T. Nakahata
Mark D. Davis
Stephen W. Miller
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, N.W., 8th Floor
Washington, D.C. 20036
(202) 730-1300
cwright@hwglaw.com

*Counsel for Sorenson Communications, LLC*

Dated:  July 12, 2019

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| Sorenson Communications, LLC | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. _____ |
| v. | ) | |
| | ) | |
| FEDERAL COMMUNICATIONS | ) | |
| COMMISSION and | ) | |
| THE UNITED STATES | ) | |
| OF AMERICA | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT
## FOR SORENSON COMMUNICATIONS, LLC

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, Sorenson Communications, LLC ("Sorenson") submits this Corporate Disclosure Statement.  Petitioner Sorenson is wholly owned by SCI Holdings, LLC, which is wholly owned by Sorenson Holdings, LLC.  As an LLC, Sorenson Holdings does not have stock.  Franklin Mutual Quest Fund holds 10% or more of Sorenson Holdings, LLC's equity.

Respectfully submitted,

/s/ Mark D. Davis

_____

Christopher J. Wright
John T. Nakahata
Mark D. Davis
Stephen W. Miller
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, N.W., 8th Floor
Washington, D.C. 20036
(202) 730-1300
cwright@hwglaw.com

*Counsel for Sorenson Communications, LLC*

Dated:  July 12, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 12, 2019, copies of the foregoing Petition for

Review and Disclosure Statement were served by U.S. mail upon the following

parties:

William Barr
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530

Thomas M. Johnson, Jr.
General Counsel
Federal Communications Commission
445 12th Street SW, 8th Floor
Washington, DC 20554

Respectfully submitted,

/s/ Mark D. Davis

_____
Christopher J. Wright
John T. Nakahata
Mark D. Davis
Stephen W. Miller
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street, N.W., 8th Floor
Washington, D.C. 20036
(202) 730-1300
cwright@hwglaw.com

*Counsel for Sorenson Communications, LLC*

Dated:  July 12, 2019

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Structure and Practices of the Video Relay Service Program | ) ) ) | CG Docket No. 10-51 |
| | ) | |
| Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities | ) ) ) ) | CG Docket No. 03-123 |

**REPORT AND ORDER AND FURTHER NOTICE OF PROPOSED RULEMAKING**

**Adopted:  May 9, 2019**                              **Released:  May 15, 2019**

**Comment Date:  [60 days after date of publication in the Federal Register]**
**Reply Comment Date:  [90 days after date of publication in the Federal Register]**

By the Commission:  Chairman Pai and Commissioners O'Rielly, Carr, Rosenworcel, and Starks issuing separate statements.

**TABLE OF CONTENTS**

| Heading | Paragraph # |
|---|---|
| I.   INTRODUCTION | 1 |
| II.  BACKGROUND | 3 |
| III. REPORT AND ORDER | 11 |
|     A.  Direct Video Access to the TRS Numbering Directory | 11 |
|     B.  TRS User Registration Database | 22 |
|        1.  Facilitating Call Validation through the TRS Numbering Directory | 22 |
|        2.  Registering Enterprise and Public Videophones in the Database | 25 |
|     C.  Prohibiting Non-Service Related Inducements | 33 |
|     D.  Technical Corrections to the TRS Rules | 38 |
| IV. FURTHER NOTICE OF PROPOSED RULEMAKING | 39 |
|     A.  Permitting At-Home Interpreting on a Permanent Basis | 39 |
|     B.  Providing Service to New and Porting Users Pending TRS-URD Verification | 55 |
|     C.  Requiring Enterprise and Public Videophone Log-In Procedures | 58 |
|        1.  Introduction | 58 |
|        2.  Neustar's Log-In Procedure Proposal | 63 |
|        3.  Exemptions | 70 |
|        4.  Alternatives to a Log-In Requirement | 75 |
|     D.  Additional Technical Correction of the Data Collection Rule | 77 |
| V.  PROCEDURAL MATTERS | 79 |
| VI. ORDERING CLAUSES | 86 |
| Appendix A – List of Commenting Parties | |
| Appendix B – Final Rules | |
| Appendix C – Proposed Rules | |
| Appendix D – Final Regulatory Flexibility Analysis | |
| Appendix E – Initial Regulatory Flexibility Analysis | |

## I.    INTRODUCTION

1.    In this Report and Order, we take steps to improve video communications for people with disabilities, while seeking to protect the video relay service (VRS) program against waste, fraud, and abuse. First, to better meet the communications needs of people who rely on American Sign Language (ASL) to communicate, we adopt rules allowing qualifying customer support call centers to add their telephone numbers to the Telecommunications Relay Service (TRS) Numbering Directory (Numbering Directory or Directory)—thereby enabling sign-language users to communicate directly with signing customer support representatives. Next, to prevent waste, fraud, and abuse more efficiently and effectively, we modify our per-call validation rule to authorize the processing of registration validation queries by the Numbering Directory rather than the TRS User Registration Database (User Database or Database). In addition, to close a gap in User Database coverage, we adopt a rule requiring registration of enterprise and public videophones in the Database. Finally, to halt VRS provider practices that erode the efficiency and effectiveness of VRS, we prohibit VRS providers from offering or providing non-service related inducements to consumers to entice them to register with a VRS provider.

2.    In the accompanying Further Notice of Proposed Rulemaking (Further Notice), to further improve VRS reliability through expanding the available pool of qualified sign-language interpreters, we propose to convert the pilot at-home interpreting program to a permanent program. To eliminate unnecessary inconvenience to VRS registrants, we also propose to permit VRS providers to commence service to new and porting VRS users for up to two weeks, pending Database verification of the user's identity, with compensation to be paid only after the user's identity is verified. Finally, we seek further comment on whether to require consumers to log in to enterprise and public videophones before using them to place VRS calls, as a means to safeguard the TRS program from waste, fraud, and abuse involving such videophones.

## II.    BACKGROUND

3.    Under section 225 of the Communications Act of 1934, as amended (the Act), the Commission must ensure the provision of telecommunications relay services (TRS) so that persons who are deaf, hard of hearing, deaf-blind, or have speech disabilities can communicate by telephone in a manner that is functionally equivalent to voice communication services utilized by persons without such disabilities.[1] VRS is a form of TRS that enables people with hearing or speech disabilities who use sign language to make telephone calls over broadband with a videophone. In addition to enabling communication between ASL users and voice users, the VRS system also enables ASL users to communicate directly with other ASL users via video.[2] In the *2017 VRS Improvements FNPRM,* the Commission sought comment on several proposals to improve ASL video communication and VRS, which are adopted in this Report and Order.[3]

---

[1] 47 U.S.C. § 225(a)(3), (b)(1). To achieve functional equivalency, the Commission's rules contain operational, technical, and functional minimum standards that govern the provision of TRS. *See* 47 CFR § 64.604 *et seq.*

[2] *See Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*; *E911 Requirements for IP-Enabled Service Providers*, CG Docket No. 03-123, CC Docket No. 98-67, WC Docket No. 05-196, Second Report and Order and Order on Reconsideration, 24 FCC Rcd 791, 821, para. 67 (2008) (*Second TRS Numbering Order*).

[3] *Structure and Practices of the Video Relay Service Program*; *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket Nos. 10-51 and 03-123, Report and Order, Notice of Inquiry, Further Notice of Proposed Rulemaking, and Order, 32 FCC Rcd 2436 (2017) (*2017 VRS Improvements FNPRM* or *2017 VRS Improvements Order*). We plan to address other aspects of the *2017 VRS Improvements FNPRM* in a subsequent order or orders.

4.    *Access to the TRS Numbering Directory for Direct Video Communication*.  In 2008, to achieve functionally equivalent communication, the Commission required VRS providers to assign North American Numbering Plan (NANP) telephone numbers to their registered users.[4]  Besides enabling VRS users to receive incoming calls from non-VRS users and facilitating the handling of VRS calls to 911 emergency services,[5] the Commission recognized that these numbers were needed to facilitate point-to-point video communication between ASL users.  Point-to-point video, the Commission stated, would support the purposes of section 225 of the Communications Act "even more directly" than relay services do.[6]  In addition to directing VRS providers to support the use of these ten digit numbers for such "direct video" calls,[7] the Commission established a Numbering Directory to provide routing information for these numbers.[8]  To avoid having direct video calls processed as relay calls, the Commission requires VRS providers to first check the Directory to determine whether the called party is a registered VRS user or is otherwise able to receive direct video calls from ASL users.[9]  If the number dialed by a registered user is found in the Directory, the provider must complete the call as a direct video call.[10]

5.    Initially, our rules only authorized the telephone numbers assigned to registered VRS and Internet Protocol Relay Service (IP Relay) users to be entered in the Directory.  Moreover, to protect the privacy and security of TRS numbers and routing information, the rules currently provide that only the TRS Numbering administrator and VRS and IP Relay providers may access the Directory.[11]  In 2015, however, the Wireline Competition Bureau (WCB) granted a Commission contractor, MITRE Corporation, access to Directory numbers and routing information to enable TRS research.[12]  Additionally, in 2017, the Consumer and Governmental Affairs Bureau (CGB) and WCB granted VTCSecure, a provider of direct video calling (DVC) services to customer support call centers, a waiver of the Directory access rules to allow it to enter telephone numbers and call routing information in the Directory for customer support call centers that are equipped to receive direct video calls.[13]  In granting

---

[4] *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*; *E911 Requirements for IP-Enabled Service Providers*, CG Docket No. 03-123; WC Docket No. 05-196, Report and Order and Further Notice of Proposed Rulemaking, 23 FCC Rcd 11591, 11601-10, paras. 20-45 (2008) (*First TRS Numbering Order*); 47 CFR §§ 64.611(a)(1)(ii), 64.613(a).

[5] *First TRS Numbering* Order, 23 FCC Rcd at 11592-93, para. 1.

[6] *Second TRS Numbering Order*, 24 FCC Rcd at 821, para. 67.  The Commission has estimated that "upwards of 80-90 percent of all calls made by ASL users on the VRS network are point-to-point."  *Structure and Practices of the Video Relay Service Program, Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket Nos. 10-51 and 03-123, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 8618, 8683, para. 164 (*2013 VRS Reform Order*).

[7] *Second TRS Numbering Order*, 24 FCC Rcd at 820-21, para. 65.

[8] *First TRS Numbering Order*, 23 FCC Rcd at 11610-16, paras. 46-63; 47 CFR § 64.613(a).

[9] *Second TRS Numbering Order*, 24 FCC Rcd at 820-21, para. 65; *see also 2017 VRS Improvements Order*, 32 FCC Rcd at 2452-55, paras. 38-45 (authorizing VRS providers to assign video telephone numbers to hearing individuals who are ASL users, to facilitate direct video communication between such persons and registered VRS users).

[10] *Second TRS Numbering Order*, 24 FCC Rcd at 820-21, para. 65.

[11] *First TRS Numbering Order*, 23 FCC Rcd at 11616-17, paras. 64-67; 47 CFR § 64.613(a)(4).

[12] *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities et al.*, CG Docket No. 03-123, Order, 30 FCC Rcd 13452 (WCB 2015).

[13] *Structure and Practices of the Video Relay Service Program*; *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket Nos. 10-51 and 03-123, Order and Declaratory Ruling, 32 FCC Rcd 775, 779-80, paras. 9-11 (WCB CGB 2017) (*VTCSecure Waiver Order*).  The Bureaus also issued a declaratory ruling that VRS providers may not refuse to recognize and route direct voice, video, or text calls originating from or directed to the domain and IP address of an NANP telephone number

(continued….)

**Federal Communications Commission**                    **FCC 19-39**

the VTCSecure waiver, the Bureaus relied on the Commission's previous finding that point-to-point video supports the purposes of section 225[14] more directly than relay services do:

> [Point-to-point video communication services] are more rapid in that they involve direct, rather than interpreted, communication; they are more efficient in that they do not trigger the costs involved with interpretation or unnecessary routing; and they increase the utility of the Nation's telephone system in that they provide direct communication—including all visual cues that are so important to persons with hearing and speech disabilities.[15]

The Bureaus also found that allowing telephone numbers for direct-video-supporting call centers to be entered in the Numbering Directory would likely reduce the TRS costs that would otherwise be borne by the TRS Fund, by enabling direct video communication with customer support to be used in lieu of VRS.[16]  Subsequently, in the *2017 VRS Improvements FNPRM*, the Commission proposed to amend section 64.613 of the Commission's rules to allow Directory access by other entities involved in enabling direct video communication with customer support centers, subject to Commission verification and approval of the qualifications of such entities.[17]

6.     *User Registration Database*.  The User Database, a centralized system of records containing TRS user registration data, provides statistics on VRS usage and helps prevent waste, fraud, and abuse by ensuring accurate registration and verification of TRS users.[18]  One of the intended functions of the Database is to validate the eligibility of each VRS call for TRS Fund support, at the beginning of the call, based on the verified user registration information associated with each VRS telephone number.[19]  Although Database registration and verification of all VRS users was required as of May 1, 2018, activation of the Database's per-call validation function awaits the completion of two tasks. First, VRS providers must be able to access Database information on a per-call basis.  In the 2017 *VRS Improvements FNPRM*, the Commission proposed to enable providers to validate a user's VRS eligibility for this purpose by querying the TRS Numbering Directory, employing a querying system that already is in use.[20]  Second, there must be a specific process for validating VRS calls placed from videophones installed in enterprises or in public locations.  Unlike VRS users' personal devices, enterprise and public videophones may be used by multiple persons, and this complicates the task of confirming whether calls

(Continued from previous page) ─────────────────

included in the TRS Numbering Directory.  *VTCSecure Waiver Order*, 32 FCC Rcd at 782, para. 19.  Subsequently, the Commission received three additional requests for access to the Directory to enable direct video calling in call centers by deaf and hard-of-hearing ASL users.  Those requests are pending.

[14] *See* 47 CFR § 225(b)(1) (directing the Commission to ensure that relay services are available "[i]n order to carry out the purposes established under section 1, to make available to all individuals in the United States a rapid, efficient nationwide communication service, and to increase the utility of the telephone system of the Nation").

[15] *Second TRS Numbering Order*, 24 FCC Rcd at 821, para. 67 (quoted in *VTCSecure Waiver Order*, 32 FCC Rcd at 779, para. 9).

[16] *VTCSecure Waiver Order*, 32 FCC Rcd at 779, para. 10.

[17] *2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2484-86, para. 125-26.

[18] 47 CFR § 64.601(a)(40) (describing the various functions of the Database); 47 CFR § 64.615(a)(1) (describing the per-call validation process); *see also 2013 VRS Reform Order*, 28 FCC Rcd at 8624, 8647-56, paras. 8, 62-86.  The Database was activated on December 29, 2017.  *Video Relay Service Providers May Begin Submitting Data to the TRS User Registration Database*, CG Docket Nos. 10-51 and 03-123, Public Notice, 32 FCC Rcd 10467 (CGB OMD 2017) (*TRS-URD Public Notice*).

[19] 47 CFR § 64.615(a)(1) (describing the per-call validation process).

[20] *2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2485, para. 128.

made from such videophones are eligible for TRS Fund support.[21]  In the 2017 *VRS Improvements FNPRM*, the Commission proposed to require both device registration and user log-in, to ensure that VRS usage of such videophones is restricted to registered users.[22]

7.     *Non-Service Related Inducements*.  VRS providers have often complained about one another's practices of giving away free items in order to retain customers or entice them away from their current default provider.  Although the Commission has issued numerous rulings prohibiting TRS providers from offering or providing improper inducements for consumers to use VRS and other forms of TRS,[23] our rule codifying these prohibitions for VRS does not specifically address the use of give-aways to induce consumers to switch VRS providers.[24]  In the Internet Protocol Captioned Telephone Service (IP CTS) context, the Commission in 2013 adopted a general rule prohibiting IP CTS providers from offering or providing to potential or existing customers "any form of direct or indirect incentives, financial or otherwise, to register for or use IP CTS."[25]  In the 2017 *VRS Improvements FNPRM*, the Commission asked whether a similar prohibition would be appropriate for VRS, including a ban on offering or providing non-service-related give-aways, such as video game systems.[26]

8.     *At-Home Call Handling*.  In the Further Notice of this item, we seek comment on additional issues, including a proposal to convert the pilot at-home call handling program to a permanent program.  In 2011, the Commission amended its rules to prohibit VRS communications assistants (CAs) from working at home.  At that time, the Commission reasoned that the lack of direct oversight of such interpreters increased the VRS program's vulnerability to fraud and abuse,[27] and that work-from-home

---

[21] *See id.* at 2481-82, para. 116.

[22] *Id.* at 2482, para. 119.

[23] *See, e.g., Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket No. 03-123, CC Docket No. 98-67, Declaratory Ruling, 20 FCC Rcd 1466 (CGB 2005) (*2005 Financial Incentives Declaratory Ruling*) (prohibiting customer loyalty programs that tie a user's minutes to points exchangeable for Internet service); *Federal Communications Commission Clarifies That Certain Telecommunications Relay Services (TRS) Marketing and Call Handling Practices Are Improper and Reminds That Video Relay Service (VRS) May Not Be Used as a Video Remote Interpreting Service*, CG Docket No. 03-123, CC Docket No. 98-67, Public Notice, 20 FCC Rcd 1471, 1473 (CGB 2005) (*2005 Call Handling Public Notice*) (prohibiting VRS providers from contacting users and suggesting, urging, or telling them to make more VRS calls); *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket No. 03-123, Order, 20 FCC Rcd 12503, 12505-06, para. 6 (CGB 2005) (prohibiting the offering of free or discounted long distance service as an incentive to TRS consumers); *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket No. 03-123, Report and Order and Declaratory Ruling, 22 FCC Rcd 20140, 20173-75, paras. 89-94 (2007) (*2007 TRS Rate Methodology Order*) (clarifying that TRS providers "may not offer consumers financial or other incentives, directly or indirectly, to make TRS calls"); *Structure and Practices of the Video Relay Services Program*, CG Docket No. 10-51, Report and Order and Further Notice of Proposed Rulemaking, 26 FCC Rcd 5545, 5559-60, paras. 21-23 (2011) (*2011 VRS Call Practices Order*) (prohibiting interpreter compensation arrangements that tie minutes processed to interpreter compensation).

[24] *2013 VRS Reform Order*, 28 FCC Rcd at 8668-69, paras. 130-33 (*adopting* 47 CFR § 64.604(c)(13)).

[25] 47 CFR § 64.604(c)(8)(i); *see also Misuse of Internet Protocol (IP) Captioned Telephone Service*; *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket Nos. 13-24 and 03-123, Report and Order and Further Notice of Proposed Rulemaking, 28 FCC Rcd 13420, 13428-35, paras. 16-29 (2013) (*2013 IP CTS Reform Order*) (adopting this and related prohibitions on providing incentives to register for or use IP CTS).

[26] *2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2486-87, para. 131.

[27] *See 2011 VRS Call Practices Order*, 26 FCC Rcd at 5554-59, 5570, paras. 13-20, 48 (adopting 47 CFR § 64.604(b)(4)(iii)).  The prohibition was adopted in response to illicit practices by numerous VRS companies

(continued....)

arrangements might not meet mandatory minimum TRS standards regarding call confidentiality, redundancy, and service quality.[28]  Revisiting the at-home prohibition in 2017, the Commission determined that during the intervening years, the many other safeguards it had adopted to strengthen oversight of VRS providers may have reduced the threat of waste, fraud, and abuse sufficiently to make it unnecessary to continue prohibiting at-home CA work arrangements.  The Commission also found that advances in network technology had likely improved VRS providers' ability to remotely supervise CAs working at home and provided new ways to ensure that at-home call handling was conducted reliably, securely, and confidentially.[29]  Therefore, the Commission authorized an experimental, one-year pilot program whereby participating VRS providers could permit some of their CAs to work at home.[30]  In the pilot program, which commenced November 1, 2017, participating VRS providers could be compensated for calls handled by CAs working at home for up to 30 percent of a provider's monthly minutes,[31] so long as the provider complied with the Commission's mandatory minimum standards; personnel, technical, and environmental safeguards; and monitoring, oversight and reporting requirements specified for at-home call handling.[32]  Each provider seeking to participate in the pilot program was required to submit a detailed compliance plan for its at-home call handling service.  Information and data gathered during the pilot would help the Commission determine the merits of making the program permanent.[33]

9.      Initially, two VRS providers under common ownership—CSDVRS, LLC, d/b/a ZVRS (ZVRS), and Purple Communications, Inc. (Purple)—were authorized to participate in the pilot program.[34]  On August 29, 2018, these providers petitioned the Commission for an extension of this program, which was scheduled to terminate on October 31, 2018, as well as a rulemaking to authorize at-home handling of VRS calls on a permanent basis.[35]  On October 31, 2018, CGB granted ZVRS and

---

(Continued from previous page) ————————————————————

operating with little or no direct accountability to the Commission.  Some of these provider practices resulted in criminal prosecution.  *Id.* at 5549-51, para. 4.

[28] *Id.* at 5556-58, paras. 17-19.  Nonetheless, the Commission indicated it would remain open to revisiting the prohibition in the future.  *Id.* at 5558-59, para. 20.

[29] *2017 VRS Improvements Order*, 32 FCC Rcd at 2456-57, paras. 48-49.

[30] *Id.* at 2455-56, para. 46.

[31] This monthly maximum is calculated as the greater of (1) 30 percent of the provider's total compensated minutes for that month, or (2) 30 percent of the provider's average monthly minutes for the 12 months ending October 31, 2017.  47 CFR § 64.604(b)(8)(iii); *2017 VRS Improvements Order*, 32 FCC Rcd at 2455-56, para. 46.

[32] 47 CFR § 64.604(b)(8); *2017 VRS Improvements Order*, 32 FCC Rcd at 2457-61, paras. 51-54.

[33] *2017 VRS Improvements Order*, 32 FCC Rcd at 2455-56, 2463, paras. 46, 59.

[34] *Authorizations Granted to CSDVRS, LLC, and Purple Communications, Inc., to Participate in the VRS At-Home Call Handling Pilot Program*, CG Docket Nos. 10-51 and 03-123, Public Notice, 32 FCC Rcd 9245 (CGB 2017).  Each of the other three VRS providers has also asked to participate in the at-home call handling pilot program.  Petition of Sorenson Communications, LLC for an Expedited Limited Waiver to Offer At-Home Interpreting Subject to the Conditions of the Pilot Program, CG Docket Nos. 10-51 and 03-123 (filed Jan. 28, 2019), https://ecfsfcc.gov/file/101282693116316/2019-01-28%20Sorenson%20Petition%20for%20Waiver%20to%20Participate%20in%20At-Home%20Interp.pdf; Petition of ASL Services Holdings, LLC dba GlobalVRS for an Expedited Limited Waiver to Offer At-Home Interpreting Subject to the Conditions of the Pilot Program, CG Docket Nos. 10-51 and 03-123 (filed Mar. 19, 2019), https://ecfsapi.fcc.gov/file/1040163441739/10-51.pdf; Petition of Convo Communications, LLC for an Expedited Limited Waiver to Offer At-Home Interpreting Subject to the Conditions of the Pilot Program, CG Docket Nos. 10-51 and 03-123 (filed Apr. 11, 2019), https://ecfsapi.fcc.gov/file/10411855702442/At%20Home%20Interpreting%20Waiver%20and%20Petition.pdf.

[35] Petition of CSDVRS, LLC dba ZVRS and Purple Communications, Inc. for Rulemaking to Permanently Authorize At-Home Video Relay Service Call Handling, CG Docket Nos. 10-51 and 03-123, at 3, Exh. A, & Exh. B (filed Aug. 29, 2018), https://ecfsapi fcc.gov/file/10829567229310/REDACTED%20-

(continued….)

Purple limited, temporary waivers permitting them to extend their participation in the program for an additional six months, or through April 30, 2019.[36]  On April 30, 2019, CGB granted additional waivers to further extend the pilot program and authorize other VRS providers to participate for up to six months, pending Commission action in this rulemaking.[37]

10.     *Commencing Service to New and Porting Users Prior to TRS-URD Verification*.  To prevent the registration of fraudulent users, our rules do not allow VRS providers to begin service to a new registrant—either a brand-new VRS user or one who is switching from another provider—until the user's identity has been verified by the User Database administrator.[38]  On June 20, 2018, the five currently certified VRS providers filed a petition requesting a limited waiver of section 64.615(a)(5) of the rules to permit the provision of VRS to new and porting users for up to two weeks pending Database verification.[39]  Noting that when hearing individuals register with a telephone company, service typically can begin immediately,[40] the VRS providers point out that the Database verification process for new VRS users can involve several steps and may consume a significant period of time.[41]  The VRS providers argue that delaying service to new registrants pending identity verification is the type of discrimination that section 225 sought to eliminate and is inconsistent with the provision's goal of making available functionally equivalent telephone service to people with disabilities.[42]  CGB sought public comment on the petition, and several consumer groups jointly filed comments in support.[43]

---

(Continued from previous page) ────────────────
%20ZVRS%20and%20Purple%20Petition%20to%20Permanently%20Authorize%20At-Home%20Call%20Handling%20(FINAL).pdf (*ZVRS/Purple Petition*).

[36] *Structure and Practices of the Video Relay Service Program*; *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket Nos. 10-51 and 03-123, Order, 33 FCC Rcd 10998 (CGB 2018) (*Pilot Program Extension Order*).

[37] *Structure and Practices of the Video Relay Service Program*; *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket Nos. 10-51 and 03-123, Order, DA 19-360 (CGB April 30, 2019) (*Second Pilot Program Extension Order*).

[38] 47 CFR § 64.615(a)(5)(ii), (iii) (prohibiting VRS providers from registering, and from seeking compensation for calls placed by, "individuals that do not pass the identification verification check conducted through the [Database]").

[39] Joint Petition of VRS Providers for a Waiver, CG Docket Nos. 10-51 and 03-123 (filed June 20, 2018), https://ecfsapi.fcc.gov/file/106200478023232/2018-06-19%20Industry%20Waiver%20Petition%20(FINAL).pdf (VRS Providers Petition).

[40] VRS Providers Petition at 7; *see also id*. at 12 ("For hearing users, porting a number from one service to another is straightforward and nearly instantaneous—and the Commission has mandated that this must occur within one business day from submission of a simple port.").

[41] *Id*. at 4 (quoting *Structure and Practices of the Video Relay Service Program*; *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket Nos. 10-51, 03-123, Order, 33 FCC Rcd 2062, 2064, para. 7 (CGB OMD 2018) (*February 2018 TRS-URD Deadline Extension Order*) (describing the steps that "may be required before a VRS user ultimately passes or fails verification")).

[42] VRS Providers Petition at 7-8.

[43] *See* Telecommunications for the Deaf and Hard of Hearing, Inc., et al., Comments, CG Docket Nos. 10-51 and 03-123 (rec. July 26, 2018); *see also* ASL Services Holdings, LLC, et al., Reply Comments, CG Docket Nos. 10-51 and 03-123 (rec. Aug. 10, 2018).

## III.     REPORT AND ORDER

### A.     Direct Video Access to the TRS Numbering Directory

11.     In order to facilitate direct video communication between sign language users and customer support call centers, we adopt the Commission's proposal to allow telephone numbers and routing information for qualifying call centers to be entered in the TRS Numbering Directory.[44] Specifically, entities meeting the conditions specified below—and designated as "Qualified Direct Video Entities" for purposes of our rules—may be granted access to the Directory in order to support direct communications between registered VRS users and customer support call centers. As the Commission has previously recognized, point-to-point video supports the purposes of section 225 more directly than VRS does, because the communication it enables is direct, rather than mediated, and far more efficient.[45] Therefore, our action today provides a major opportunity to enhance the ability of sign language users to engage in more effective, efficient, and private communication with customer support[46]—especially because so much of VRS traffic involves calls placed to the customer support call centers of large businesses and government agencies.[47] For the same reason, enabling such communication makes possible major cost savings for the TRS Fund, by reducing the need for third-party CAs to participate in customer support calls.[48] Commenters generally support granting access to the Directory for these purposes.[49]

12.     To implement this change, we first clarify who can be afforded such Directory access. In the 2017 *VRS Improvements FNPRM*, the Commission proposed that Directory access be available to "providers" of direct video customer support "service."[50] However, a variety of entities may be responsible for operating direct video communications at a customer support center, not all of which

---

[44] *See 2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2484-85, paras. 125-26. For purposes of this proceeding, we define such "direct video customer support" as a telephone customer support operation that enables callers with hearing or speech disabilities to engage in real-time direct video communication in ASL with ASL speakers in a call center. *See infra* Appendix B, Final Rules (adding 47 CFR § 64.601(a)(13)).

[45] *See Second TRS Numbering Order*, 24 FCC Rcd at 821, para. 67; *VTCSecure Waiver Order*, 32 FCC Rcd at 779, para. 9.

[46] *See* Telecommunications for the Deaf and Hard of Hearing, Inc., National Association of the Deaf, California Coalition of Agencies Serving the Deaf and Hard of Hearing, Deaf and Hard of Hearing Consumer Advocacy Network, Cerebral Palsy and Deaf Organization, and Deaf Seniors of America (collectively, Consumer Groups) Comments at 7 (rec. May 30, 2017) (Consumer Groups Comments) (direct sign language customer support provides a call experience equivalent to that of a call between two hearing persons); *see also VTCSecure Waiver Order*, 32 FCC Rcd at 779, para. 9 (agreeing with Gallaudet University Comments that "[w]ith direct video communications, especially if the call takers are members of the deaf community themselves, the risk for mistranslations between ASL and English is eliminated, and thus the risk for costly and frustrating misunderstandings is also greatly reduced, if not eliminated.").

[47] In 2013, the Commission noted that over 12% of VRS minutes were generated by calls placed to just 100 telephone numbers, which are generally the customer support numbers of large businesses and government agencies. *2013 VRS Reform FNPRM*, 28 FCC Rcd at 8708, para. 223; *see also* Consumer Groups Comments at 7 (citing similar statistics).

[48] 47 U.S.C. §225(b)(1) (requiring the Commission to ensure that TRS is available to the extent possible and "in the most efficient manner" to people with hearing and speech disabilities).

[49] *See* Communication Service for the Deaf, Inc. (CSD) Comments at 2 (rec. May 30, 2017); Consumer Groups Comments at 6-7; Convo Comments at 14-15 (rec. May 30, 2017); GlobalVRS Comments at 10 (rec. May 30, 2017); Sorenson Comments at 23-24 (rec. May 30, 2017); ZVRS Holding Company, ZVRS, and Purple (ZVRS) Reply Comments at 14-15 (rec. June 26, 2017).

[50] *2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2484-85, paras. 125-26.

would necessarily fall under the definition of a "service provider." Because the purpose of this rule is to facilitate the use of telephone numbers to reach direct-video-capable customer support centers, we define a Qualified Direct Video Entity that may be granted Directory access as an individual or entity that is engaged in direct video customer support and that (1) is the end-user customer that has been assigned the telephone number(s) used for direct video customer support calls or (2) is the designee of such an entity.[51]

13.    *Obtaining Numbering Directory Access.* In order to obtain authorization for access to the Directory as a Qualified Direct Video Entity, an interested party must submit an application to CGB that includes: (1) the applicant's name, address, telephone number, and email address; (2) a description of the service to be provided; (3) an acknowledgment that Directory access is conditional on compliance with applicable Commission rules, obligations, and standards;[52] (4) contact information for personnel responsible for such compliance; and (5) certification that the applicant's description of service meets the definition of direct video customer support and that the information provided is accurate and complete.[53] CGB, in consultation with the Commission's Office of the Managing Director, shall approve Directory access if the applicant demonstrates, through its responses to each of the above requests for information and any additional information requested by CGB, that it has a legitimate need for such access and is aware of its regulatory obligations.[54] A Qualified Direct Video Entity may relinquish its Directory access authorization by so notifying the Commission, and such authorization will terminate automatically if one year elapses with no call-routing queries received regarding any of the Entity's numbers.[55] Further, the Commission may terminate such authorization if it determines, after notice to the entity and an opportunity to contest such termination, that the entity is no longer qualified as described in its application, has materially misrepresented information to the Commission, the TRS Numbering administrator, or the User Database administrator, has failed to provide required information in the format requested, or has violated an applicable Commission rule or order. Following the termination of an authorization, the TRS Numbering administrator shall remove the previously authorized entity's telephone numbers from the TRS Numbering Directory.

14.    After receiving Commission approval, a Qualified Direct Video Entity shall enter a telephone number into the Directory by submitting the telephone number, associated call routing

---

[51] *See generally* 47 CFR § 52.20 *et seq.* For example, if the telephone number used to reach the customer support center is covered by our toll-free number portability rules, the Qualified Direct Video Entity may be an entity that is engaged in direct video customer support for ASL users and that (1) meets the definition of a "Responsible Organization" or a "Toll Free Subscriber," or (2) is the designee of such the Toll Free Subscriber. *See id.* § 52.101(b) (defining "Responsible Organization" as "[t]he entity chosen by a toll free subscriber to manage and administer the appropriate records in the toll free Service Management System for the toll free subscriber"); *id.* § 52.101(e) (defining "Toll Free Subscriber" as "[t]he entity that requests a Responsible Organization to reserve a toll free number from the SMS database").

[52] *See, e.g.*, *infra* para. 16 (detailing certain applicable requirements).

[53] The information to be provided is comparable to some of the information collected for certification of Internet-based TRS providers and for approval of interconnected VoIP provider numbering authorizations. *See* 47 CFR §§ 52.15(g), 64.606(a)(2). Qualified Direct Video Entities will be subject to a Commission authorization within the meaning of section 503(b)(5) of the Act. 47 U.S.C. § 503(b)(5).

[54] Multiple commenters support such a requirement. *See, e.g.*, Sorenson Comments at 26; Convo Comments at 14; ZVRS Reply Comments at 14.

[55] Under the current system, when a VRS user initiates a call, and the number dialed is not in the serving VRS provider's own database, the VRS provider queries the Directory regarding the dialed number, in order to determine how to route the call. Thus, whenever a VRS user dials a number that has been entered in the Directory by a Qualified Direct Video Entity, a query to the Directory will be made. Expiration of a one-year period, with no per-call validation queries received regarding any of a Qualified Direct Video Entity's numbers, provides a clear indication that the numbers are no longer being used for this purpose.

information, and registration information in accordance with instructions provided by the TRS Numbering administrator.  For each customer support telephone number to be entered into the Directory, unless otherwise instructed by the User Database administrator, a Qualified Direct Video Entity must create an equivalent entry in the Database by providing:  the Entity's name; the date that the Entity was approved for Directory access; the name of the end-user customer support call center(s) (if different from the Entity); contact information for the end-user customer support call center(s) that will receive calls placed to the customer support number;[56] and other information reasonably requested by the User Database administrator.  Providing such information will enable the User Database administrator and the TRS Numbering administrator to confirm that the Qualified Direct Video Entity has been approved for Directory access and will help ensure that the Directory provides an appropriate response to a VRS provider's per-call validation query regarding the customer support telephone number.  A Qualified Direct Video Entity must provide appropriate notification as directed by the User Database administrator and the TRS Numbering administrator if any of the information provided changes or if a customer support number entered in the Directory is transferred to a different Qualified Direct Video Entity or is no longer being used for a qualified direct video purpose.  The User Database administrator shall remove from the User Database each customer support telephone number for a Qualified Direct Video Entity that has had its authorization to access the TRS Numbering Directory terminated.

15.    A Qualified Direct Video Entity's Directory access includes (1) adding and deleting customer support telephone numbers and routing information, (2) conducting data queries to obtain routing information for outbound point-to-point video calls originating from such telephone numbers, (3) conducting data queries to enable the transfer of inbound direct video calls to a VRS provider when needed, and (4) performing other necessary administrative functions as determined by the TRS Numbering administrator in consultation with the User Database administrator and the Commission.

16.    Qualified Direct Video Entities granted access to the TRS Numbering Directory will be held to the same rules and obligations that govern VRS providers' access to the Directory and use of Directory numbers,[57] including complying with the instructions of the TRS Numbering administrator, and applicable standards pertaining to privacy, security, and reliability.[58]  To ensure effective telephone communication, we further require that videophones, software, and transmission protocols used for direct video customer support adhere to the same interoperability standards applicable to VRS providers.[59]  Further, Qualified Direct Video Entities may be subject to fees to recover any additional costs incurred by the TRS Numbering administrator or other TRS administrators.  Accordingly, we do not anticipate that any significant regulatory burdens or costs will be imposed on the TRS Fund or VRS providers by our

---

[56] Contact information should include a telephone number, e-mail address, or mailing address, as available.

[57] *See* Consumer Groups Comments at 6-7 (urging that these entities should be subject to the same consumer protection rules applicable to VRS providers); Convo Comments at 14; Sorenson Comments at 26-28 (advocating steps to avoid compromising security, reliability, and privacy of the TRS Numbering Directory); ZVRS Reply Comments at 14; *see also VTCSecure Waiver Order*, 32 FCC Rcd at 780-81, para. 14.

[58] *See generally First TRS Numbering Order*, 23 FCC Rcd at 11598-601, paras. 14-19 (discussing authority to adopt a system for assigning Internet-based TRS users ten-digit telephone numbers); *VTCSecure Waiver Order*, 32 FCC Rcd at 780, para. 13.  Because registered VRS users will continue to be customers of their default VRS providers, and not DVC customer support centers, we do not expect that parties associated with a DVC customer support center would have access to VRS users' customer proprietary network information (CPNI).  *See id*. at 781, para. 16.  However, such parties must adhere to the same privacy and security standards as VRS providers regarding information retrieved from the TRS Numbering Directory, including any CPNI that they may access.  *See* 47 CFR §§ 64.611(c) (obtaining and provisioning routing information); *id*. §§ 64.5101-5111; *see also First TRS Numbering Order*, 23 FCC Rcd at 11615, para. 60 (requiring entities with access to the TRS Numbering Directory to provision routing information directly to the directory reduces database security risks).

[59] *See* 47 CFR §§ 64.619, 64.621; *VTCSecure Waiver Order*, 32 FCC Rcd at 780, para. 13.

action today.[60]  Moreover, because participation by video entities is strictly voluntary, we are confident that the benefits of such participation will far exceed the minimal participation costs incurred by those entities choosing to participate.

17.     *Customer Support Telephone Numbers for VRS and Direct Video Callers*.  In the 2017 *VRS Improvements FNPRM*, the Commission also sought comment on whether a telephone number that is made available to and used by the general public to reach a customer support center may also be used for direct video communications and be entered in the Directory for that purpose.[61]  Enabling sign language users to access customer support services through the same telephone numbers used by voice callers may offer benefits to such users—by eliminating the need for sign language users to keep track of separate video numbers in order to reach call centers via direct video.  However, we also recognize that sign language users may sometimes need to use VRS to reach customer support supervisors and other personnel who do not use ASL.[62]  We conclude that the most appropriate resolution of this issue is to let the business or government agency involved determine whether to make direct video communication available via a dedicated video number or via the generally advertised customer support number, as long as consumers retain the ability to communicate with customer support centers through VRS.  Below, we explain how the rule we adopt preserves sign language users' ability to use VRS to communicate with a customer support center (whether the telephone number entered in the directory is used for video calls only or is used for both video and voice calls to the customer support center), both at the outset of a call and via transfer of an ongoing call.

18.     *Outset of a Call – Dedicated Direct Video Customer Support Number*.  If the telephone number entered in the Directory is a dedicated direct video line that is *different from* the company's generally advertised telephone number, a consumer will be able to choose between dialing the dedicated direct video number or dialing the generally advertised customer support number and communicating through VRS.[63]  If operating a dedicated DVC customer support number, businesses or government agencies may also use interactive response systems that allow the host system to interact with the VRS user through the use of ASL and dual-tone multi-frequency signaling (DTMF).  Currently, before setting up a relay call, VRS providers must check the Directory to ensure that the call is not being made to a destination telephone number that can accept video calls directly.[64]  If the call center uses a dedicated

---

[60] *See* GlobalVRS Comments at 10-11; Sorenson Comments at 29-30 (each raising concerns about the costs these requirements may impose on VRS providers).  VRS providers may incur some costs to implement a call transfer protocol, for the purpose of converting direct video calls to VRS calls in the event that an ASL-using video caller wishes to be transferred to a non-ASL-speaking supervisor or employee.  Although we anticipate that any such costs will be minimal, such costs and other costs associated with implementation of this requirement may be treated as exogenous costs caused by new regulatory requirements.  Criteria for VRS exogenous cost recovery are set forth in the Commission's *2017 VRS Compensation Order.  Structure and Practices of the Video Relay Service Program*; *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket Nos. 10-51 and 03-123, Report and Order, Notice of Inquiry, Further Notice of Proposed Rulemaking, and Order, 32 FCC Rcd 5891, 5925, para. 66 (2017) (*2017 VRS Compensation Order*), *aff'd Sorenson Communications, LLC v. FCC*, 897 F.3d 214 (D.C. Cir. 2018) (*Sorenson*).

[61] *2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2484-85, para. 126.

[62] *See* Consumer Groups Comments at 7-8; *see also* Convo Comments at 14-15; CSD Comments at 3; Sorenson Comments at 24-26; ZVRS Reply Comments at 15.  ASL users may also need to access a customer call center through VRS if, for example, the center only employs a single ASL speaker, and that person is not be available at the time a call is made. Consumer Groups Comments at 8.

[63] *See* Consumer Groups Comments at 8-9.

[64] *Second TRS Numbering Order*, 24 FCC Rcd at 821, para. 65 ("Checking the Numbering Directory to see whether the user is dialing another registered VRS user—that is, requesting a point-to-point communication—will ensure that providers do not establish a relay call when it is unnecessary and inappropriate to do so.").

number for direct video calls, only the dedicated number will be listed in the Directory, and VRS users seeking to communicate via direct video must dial that dedicated number. The generally advertised customer support number *will not be* listed in the Directory; therefore, a VRS user who wishes to initiate a customer support call via VRS can simply dial the general customer support number, instead of the dedicated video number, and a VRS provider will automatically handle the call as a VRS call, in the same manner as when a VRS user dials any voice telephone number.[65]

19.     *Outset of a Call – Single Unified Customer Support Number*. Alternatively, the direct video number entered in the directory may be *the same as* the generally advertised telephone number used for voice calls to the customer support call center. In this case, VRS users seeking to communicate with customer support via direct video will simply dial the generally advertised number on their videophone, and—because that generally advertised number *will be* listed in the Directory—the call will be routed directly to the customer support center as a point-to-point video call.[66] The customer support center then will detect the call as a videophone call and connect the caller directly to a representative using sign language, a sign language-enabled Interactive Video Response system, or another appropriate network termination for the sign language user. Sign language users who instead wish to use VRS will be able to bypass the direct video option by first entering their VRS provider's URL (or selecting a menu option on their device's screen to do this) and then directing the VRS CA to place a VRS call to the generally advertised customer support number. Once the CA is on the call, it will be routed as a voice call and detected as such by the customer support center. Any prompts or announcements conveyed to VRS users regarding calls to direct-video-equipped call centers must be neutral and must not be worded so as to "steer" the user toward requesting that a customer support call be handled as a VRS call rather than as a direct video call.[67]

20.     Of course, unified customer support numbers need to be identifiable as such to both providers and TRS administrators. We direct the TRS Numbering administrator to implement a method for identifying single unified customer support numbers (e.g., by adding an appropriate field to the format for routing query responses). We also direct the TRS Fund administrator to provide a method for reporting VRS calls involving unified customer support numbers and verifying the compensability of such calls. We direct the Disability Rights Office to announce the effective date for the rules governing single unified customer support numbers once these steps have been taken.

21.     *Converting Direct Video Calls to VRS*. Under either of the above alternatives, authorizations for TRS Numbering Directory access are conditional on the customer support center being able to initiate a call transfer that converts a point-to-point video call into a VRS call, in the event that a VRS user communicating with a direct video customer agent needs to be transferred to a hearing person, such as a supervisor or specialist within the customer support center, while the call is in progress. Although we do not mandate how this is to be done, we note that existing protocols, such as the Session Internet Protocol (SIP) transfer procedure, provide a framework for call transfers, whereby the caller's default VRS provider could re-connect the call to a VRS CA, who would then complete the call between

---

[65] In addition, as explained below, a call center that offers direct video communication via a dedicated video number must still ensure that calls initiated as direct video can be transferred to VRS.

[66] Thus, when a registered VRS user dials a DVC telephone number that is entered in the Directory, the VRS provider must route the call as a point-to-point video call—*even if the same telephone number is also usable to place voice calls to the customer support call center*. This does not, however, diminish the caller's right to make such a call by going through the provider's "front door" and specifically requesting that the call be treated as a VRS call, as explained in the text following this footnote.

[67] For example, the use of on-screen menus that encourage users to choose VRS over DVC or make it more challenging for users to access DVC than VRS, is impermissible. These serve as examples only and are not intended to be inclusive of all prohibited activities that could make it more difficult for users to access DVC over VRS.

the VRS user and the hearing customer support agent via VRS.[68] As there is at least one commonly deployed mechanism for dynamically, seamlessly upgrading a direct video call to a VRS call that is a common part of the SIP standard, we believe there will be little cost to this integration, and that such costs will be exceeded by the benefits of enabling videophone users to easily access VRS providers when CA services are necessary. Further, the VRS provider's obligation to implement such a call transfer on request is consistent with a VRS provider's obligations to route and deliver a user's inbound and outbound calls, ensure interoperability, and provide functionally equivalent service.[69] To expedite this process, we encourage VRS providers and Qualified Direct Video Entities to work cooperatively to implement the necessary technical changes for such call transfers that minimize the burden to VRS users to communicate with the appropriate party on a call. No later than six months after the effective date of the amendments to this section,[70] each VRS provider shall be capable of activating an effective call transfer procedure within 60 days after receiving a request to do so from a Qualified Direct Video Entity. Finally, to the extent that call transfers of this kind are prohibited by the VRS Provider Interoperability Profile technical standard, we exempt such call transfers from such prohibition.[71]

B.    **TRS User Registration Database**

1.    **Facilitating Call Validation through the TRS Numbering Directory**

22.    The Commission's rules require VRS providers to validate the eligibility of the party on the video side of each VRS call by querying the User Registration Database.[72] The Commission deferred activation of this querying function pending development of an efficient querying method and a solution for registering public and enterprise videophones.[73] We now amend our rules, as proposed in the 2017 *VRS Improvements FNPRM*,[74] to allow for implementation of a querying method that makes use of the existing TRS Numbering Directory querying system.[75] Specifically, we amend the rules to require VRS providers to direct call validation queries to the appropriate system of records (either the Numbering Directory or the User Database) that is identified in the relevant instructions, which will be issued by the Commission, the TRS Fund administrator, or the TRS Numbering administrator.[76] We take this action,

---

[68] *See* Internet Engineering Task Force (IETF) Request for Comments (RFC) 5589, Session Initiation Protocol (SIP) Call Control – Transfer (June 2009), https://tools.ietf.org/html/rfc5589.

[69] *See* 47 U.S.C. § 225; 47 CFR §§ 64.611(a), 64.621(a). Qualified Direct Video Entities likewise must adhere to the interoperability standards applicable to VRS providers. *Supra* para. 16.

[70] *See infra* para. 87 (deferring the effective date of certain rule amendments pending Office of Management and Budget approval of new or revised information collections).

[71] *See* 64 CFR § 64.621(b)(1) (incorporating by reference the VRS Provider Interoperability Profile); Letter from John T. Nakahata, Counsel to Sorenson to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 10-51 and 03-123, at 6 (filed Apr. 30, 2019) (Sorenson April 30, 2019 *Ex Parte*) (asserting that call transfers are prohibited by that technical standard, due to a lack of clear compensation filing instructions for transferred calls). To address any insufficiency in compensation filing instructions—the asserted basis for such prohibition—we direct the TRS Fund administrator to revise its filing instructions to provide appropriate and timely guidance to VRS providers on the format to be used and the information to be provided when claiming compensation for VRS calls that are involved in such call transfers.

[72] 47 CFR § 64.615(a)(1); *see also 2013 VRS Reform Order*, 28 FCC Rcd at 8651, para. 72.

[73] *See supra* para. 6.

[74] *2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2485, para. 128.

[75] Under this method, the Directory will have an indicator showing whether a number is also registered in the Database as the telephone number of an eligible VRS user (as opposed to a number that is authorized only for direct video communication).

[76] The Commission's current plan is to set up the querying function in the Directory. Regardless, VRS providers will not be required to query both databases. *See* GlobalVRS Comments at 11; ZVRS Reply Comments at 15. We

(continued....)

which is supported by most commenters,[77] to provide greater flexibility for administration of the VRS program and enable the operation of TRS data systems in the most effective and efficient way.[78]

23.    With the adoption of this rule change, as well as the requirement for registration of enterprise and public videophones, discussed below, the stage is set for activation of the per-call query function.  The User Database administrator has been working with providers for several years to ensure that all systems associated with the proper functioning of the Database will operate efficiently when activated.  A compliance date for the per-call validation requirement will be set by public notice, which will be issued by CGB no earlier than 90 days after the expiration of the 120-day window for submission of enterprise and public videophone registration data to the Database.[79]  This will allow a period of parallel operation once all of the data is submitted to the Database, but before providers are required to rely on the per-call validation queries.  We emphasize, however, that per-call validation queries will be required only after the Database and TRS Numbering administrators, in consultation with the Commission's Office of the Managing Director and CGB have determined (and have notified VRS providers) that the per-call query process is fully functional and will not result in unnecessary blocking of calls.  By proceeding in this manner, we minimize any likelihood that data errors might prevent valid VRS calls from being routed or that delays might occur in the validation of calls to or from some registered users.[80]  Although Sorenson speculates that delays might still occur based on the method chosen for updating the Directory,[81] we can find no evidence in the record indicating that such updating would interfere with registered users' ability to make VRS calls.

24.    Sorenson also claims that per-call validation could be delayed due to the need to verify a user's identity.[82]  Database registration and identity verification, however, generally are completed in advance of VRS use and are addressed by separate rule provisions that are already in effect.[83]  Any delays in the registration and verification of user identities will occur independently of per-call validation and are unlikely to be extended as a result of its activation.[84]  We also note that compliance with per-call

(Continued from previous page) ───────────────────

also clarify that when a VRS user is making multiple calls in the same session, only the initial VRS call must be validated.  *See, e.g.*, Convo Comments at 15; ZVRS Reply Comments at 15 (each expressing support for this approach).

[77] *See, e.g.*, Convo Comments at 15; GlobalVRS Comments at 11; ZVRS Comments at 11 (filed May 30, 2017).

[78] *See 2013 VRS Reform Order*, 28 FCC Rcd at 8649, para. 68 & n.167.  Costs incurred to comply with the per-call validation rule may qualify for exogenous cost recovery.  *See 2017 VRS Compensation Order*, 32 FCC Rcd at 5925, para. 66; *see also* GlobalVRS Comments at 11; ZVRS Reply Comments at 15.

[79] *See infra* Part III.B.2.  As of the compliance date, when VRS calls are placed to or from enterprise and public videophones, a per-call validation query will be required to confirm that the required videophone registration information has been entered in the Database.

[80] Sorenson Comments at 30-33.

[81] *Id*. at 32 & n.52; *see also* Sorenson Comments Attach. at Exh. C, paras. 9-11.

[82] Sorenson Comments Attach. at Exh. C, para. 6.

[83] VRS providers are currently prohibited from registering users who have not passed the Database verification check.  *See* 47 CFR § 64.615(a)(5)(ii).  In the Further Notice, we propose to amend this provision to minimize any inconvenience to new and porting VRS users in case of a delay in the completion of identity verification.

[84] In this regard, we note that VRS providers have been on notice since 2008 that calls will be compensated only if the user has previously registered with a default VRS provider and the user's telephone number has been entered in the TRS Numbering Directory.  *See Second TRS Numbering Order*, 24 FCC Rcd at 803, para. 24 (explaining that a dial-around caller's telephone number "can be used to verify whether the user is registered with another provider . . . with a simple query to the Numbering Directory" and clarifying that "if a provider is unable to discern whether someone attempting to use its service is an existing user, then it should treat such user as a new user," i.e., by requiring the user to register).

validation will not be required until after the end of the registration period for enterprise and public videophones, discussed below. This extended deferral of the activation of per-call validation renders it even less likely that any technical problems associated with the start-up of the Database would cause unwarranted delays in the validation of VRS calls.[85] Accordingly, we decline to defer the compliance date for the per-call validation requirement for a longer period.[86]

### 2. Registering Enterprise and Public Videophones in the Database

25.     With few modifications, we adopt the Commission's proposal to require VRS providers to submit registration information to the User Registration Database administrator for public and enterprise videophones.[87] Registration of enterprise and public videophones, which is supported by several commenters,[88] is necessary to assist the Fund administrator in reviewing compensation requests involving such videophones and auditing how such videophones are used, and thereby to help prevent waste, fraud, and abuse in the VRS program. Under the rules we adopt, a VRS provider must submit registration information for any enterprise or public videophone for which it assigns or receives a port of a NANP telephone number (i.e., for which it is the default VRS provider). As with individual user registrations, once an enterprise or public videophone has been registered in the User Registration Database, the videophone's telephone number will be transmitted to the TRS Numbering Directory to enable per-call validation queries.

26.     We do not address at this time the Commission's proposal to require default VRS providers to implement log-in procedures for individuals using enterprise and public videophones for VRS calls.[89] In the Further Notice, we seek additional comment on that proposal, as well as alternative proposals. Pending Commission action on the log-in proposal, VRS providers will be paid for compensable calls that are completed to and from such videophones in compliance with rules in effect at the time of the call, including the per-call validation and videophone registration requirements adopted in this Report and Order.

27.     *Definitions.* No parties commented on the Commission's proposed definitions of enterprise and public videophones, and we adopt those definitions with minor modifications. Thus, we define an "enterprise videophone" somewhat more expansively than initially proposed, as a videophone maintained by a business, organization, government agency, or other entity and designated for use by its employees or other individuals in private or restricted areas. By making clear that "enterprise videophone" includes —in addition to phones used by employees[90]—phones used by "other individuals in private or restricted areas," we accommodate the practical reality that videophones provided by enterprises may be situated in a variety of locations, including private or shared offices, conference rooms, other common rooms, or hospital rooms, and therefore may be intended for use by individuals other than "employees"—while still not fitting the definition of a "public" videophone. We define a "public videophone" as a videophone maintained by a business, organization, government agency, or other entity, and made available for use by the public in a public space, such as a public area of a

---

[85] Further, any issues with verification of the identity of existing users will not affect per-call validation.

[86] *See* Sorenson Comments at 4.

[87] *2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2483, paras. 121-23.

[88] *See, e.g.*, GlobalVRS Comments at 10; ZVRS Comments at 11.

[89] *2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2482-83, paras. 119-20.

[90] The proposed definition of "enterprise videophones" was limited to "videophones provided by entities such as businesses, organizations and governmental agencies that are designated for use by their *employees* who use ASL." *Id.* at 2482, para. 117 (emphasis added).

business, school, hospital, library, airport, or government building.[91]  As adopted, both definitions make clear that the covered devices may be used for point-to-point calls by people who may not know American Sign Language (ASL).  Because the TRS Fund does not compensate for point-to-point calls, there is no reason to require ASL as opposed to any other form of sign language during such calls.[92]

28.     *Registration and Certification Requirements.*  Adopting the Commission's proposed registration rule with minor changes, we require each VRS provider to submit the following registration information for enterprise and public videophones for which it assigns or receives a port of a NANP telephone number:  the name of the default VRS provider; the videophone's NANP telephone number; the name and physical address of the organization, business, or agency where the enterprise or public videophone is located;[93] the date that the default VRS provider initiated service to the videophone;[94] the name of the individual associated with the organization, business, or agency who is responsible for the videophone;[95] and confirmation that the provider has obtained a signed certification from that individual stating that such person understands the function of the videophone and that the cost of VRS calls made on the videophone is financed by the federally regulated Interstate TRS Fund.

29.     For enterprise videophones, the signed certification must also include a statement from the responsible individual that the organization, business, or agency will make reasonable efforts to ensure that only persons with a hearing or speech disability are permitted to use the phone for VRS.[96]

---

[91] The *2017 VRS Improvements FNPRM* proposed defining these public phones as devices "made available in public spaces, such as schools, hospitals, libraries, airports and governmental agencies, for use by any individuals who communicate through ASL."  *Id.*

[92] GlobalVRS seeks additional clarification on the permissibility of three-way calling where one party to the call is using a public videophone. GlobalVRS Comments at 10 n.11.  We note that, under our TRS rules, VRS providers must "be capable of handling any type of call normally provided by telecommunications carriers unless the Commission determines that it is not technically feasible to do so," including three-way calls.  47 CFR §§ 64.604(a)(3)(ii), (vi)(C).  Thus, VRS providers are not only permitted but required to handle three-way calls that are otherwise eligible for VRS compensation.

[93] For 911 calls placed from enterprise and public videophones, this address may serve as the initial Registered Location for users of such videophones.  *See* 47 CFR § 64.605(b)(4).  In the *2017 VRS Improvements FNPRM*, the Commission proposed submission of the business address for enterprise phones and the physical address for public phones.  *2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2483, paras. 122-23.  Because knowledge of the actual location where these phones are positioned may be necessary for the Commission to conduct on-site inspections, we will require submission of the physical address for both types of devices.

[94] Although in the *2017 VRS Improvements FNPRM*, the Commission proposed submission of the date on which the videophone was placed in its location, *2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2483, paras. 122-23, we find the date of service initiation is more relevant to payment of TRS Fund compensation.

[95] Although the Commission proposed to collect the name of such person for enterprise phones only, we conclude that collecting such information for public phones as well will facilitate investigation of misuse of these devices, if necessary.

[96] Although in the *2017 VRS Improvements FNPRM* the Commission used the terminology "the best of that person's ability," *2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2483, para. 122, it would not be consistent with the Commission's efforts to prevent waste, fraud, and abuse to settle for efforts that are unreasonable even if they arguably could be said to be "the best" a given individual could do.  While we expect that most enterprises would, in any case, select individuals whose best efforts would represent reasonable efforts within the meaning of our rule, the revised formulation guards against the risk from possible outliers that might not be as diligent in selecting individuals whose efforts would be reasonable.  Reasonable efforts could include maintaining a list of users, requiring such individuals to provide proof of registration (such as the user's VRS telephone number) when requesting to use a videophone, and maintaining a copy of the user's request.  We recognize however, that reasonable efforts may vary by entity, potential users, and location of the videophone.  *See* Letter from Gerard J. Buckley, President and Dean, National Technical Institute for the Deaf, Rochester Institute of Technology, to

(continued….)

The VRS provider must also state whether the device is assigned to a hearing individual who knows sign language[97] and identify the specific type of location where the videophone is placed within the organization, business, or agency,[98] to enable the administrator to conduct studies of how these phones are used and to identify unusual calling patterns that might signal waste, fraud, or abuse.

30.    We conclude that this information, which is comparable to the registration information required for individual users, is needed to enable review of compensation requests and audit of how such videophones are used, and thereby to prevent waste, fraud, and abuse in the VRS program.[99] We are not persuaded that personnel turnover within businesses will make it difficult to submit and update this information,[100] as it is standard practice for entities to maintain and update points of contact with other organizations, businesses, and agencies.[101] No commenter opposed inclusion of the specific registration information proposed by the Commission, except for the tax identification (ID) number of a registering enterprise, which we will not require because other information is available to verify the identity and location of an enterprise.[102] As proposed, we require VRS providers to maintain the confidentiality of any registration and certification information they obtain for enterprise and public videophones.[103]

31.    *Timeframe for Compliance.* We will release a public notice announcing a 120-day period within which VRS providers must submit registration information to the Database administrator for all enterprise and public videophones then in service. Although the Commission proposed a 60-day period

---

(Continued from previous page) ————————————————

Marlene H. Dortch, Secretary, FCC CG Docket Nos. 10-51 and 03-123 at 1-2 (filed May 2, 2019) (RIT May 2, 2019 *Ex Parte*); Letter from Danielle Burt, Counsel for Telecommunications for the Deaf and Hard of Hearing, Inc. to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 10-51 and 03-123, at 1-3 (filed May 2, 2019) (Consumer Groups and Gallaudet May 2, 2019 *Ex Parte*); Sorenson April 30, 2019 *Ex Parte* at 3.

[97] *See* Sorenson April 30, 2019 *Ex Parte*, Attach. at A-1. Requiring the reporting of enterprise videophones assigned to hearing users will help the Database administrator, Numbering Directory administrator, and TRS Fund administrator ensure such videophones are appropriately limited to point-to-point communications and that compensation is not provided for calls to and from the devices.

[98] For example, whether the videophone is maintained at a reception desk or other common work area, a private workspace, a private room in a hospital or long-term care facility, or another restricted area. *See* Letter from Mark D. Davis, Counsel for Sorenson Communications, LLC, to Marlene Dortch, Secretary, FCC, CG Docket Nos. 03-123 and 10-51 (filed Mar. 25, 2019); *id.*, Attach., "Proposed Customer Classification Table" ("Sorenson Classification Proposal") (proposing to separately classify enterprise videophones assigned to a single employee ("Entity Deaf Assigned") from those assigned to a location with supervision ("Entity Supervised Deaf-Use"), and noting that for the latter classification Sorenson collects information on "Name of location"); *see also* Sorenson April 30, 2019 *Ex Parte* at 4.

[99] The information required is also consistent with that proposed by Sorenson in a recent *ex parte* submission. *See* Sorenson Classification Proposal.

[100] *See* Convo Comments at 14.

[101] For example, the Commission requires contact information to be provided by advanced communications service providers and manufacturers under its accessibility rules. *See*, *e.g.*, 47 CFR § 14.31(b)(2).

[102] *See* Sorenson Comments at 23; ZVRS Comments at 11; Letter from David W. Rolka, President Rolka Loube, to FCC, CG Docket Nos. 10-51 and 03-123, at 1 (filed Sept. 25, 2017) (Rolka Loube *Ex Parte* Letter) (each recommending that tax ID numbers not be collected). In the *2017 Improvements FNPRM*, the Commission sought comment on whether there should be any exception to the enterprise and public videophone information collection requirements for governmental entities that are restricted in their ability to provide certain information due to national security concerns. *2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2483, para. 122. No one commented on this question. If such a scenario arises and causes a particular concern, the affected party could request a waiver pursuant to 47 CFR § 1.3.

[103] *See 2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2503, Appx. C.

for this purpose,[104] we are persuaded, based on the Commission's experience with the initial uploading of VRS user information to the database, that a 120-day period is appropriate to allow sufficient time for providers to collect and submit the required registration information.[105]  For VRS calls placed *on or before* the data submission deadline (i.e., the last day of this 120-day period) to and from phone numbers identified by TRS providers as associated with enterprise and public videophones, compensation will be paid if such calls are determined to be compensable in accordance with the procedures in place as of the date of the call.  For calls placed *after* the data submission deadline, if registration data for the enterprise or public videophone was submitted to the Database *on or before* the data submission deadline, and the verification check is not completed as of that deadline, compensation will be paid or withheld in accordance with the guidance provided in the *TRS-URD Registration Extension Order*.[106]  If a public or enterprise videophone is activated after the data submission deadline, or if registration information for an existing phone is not submitted until after the deadline, VRS calls to or from the videophone are compensable only if made after the registration data has been submitted *and verified*.[107]

32.     *Terminations and Usage Monitoring*.  As proposed, we require VRS providers to monitor enterprise and public videophone usage and to report any unusual activity to the TRS Fund administrator.[108]  We note that under our existing rules, VRS providers are prohibited from engaging in any practice that they know or have reason to know may cause or encourage unauthorized use of VRS, and are required to report any such practice to the Commission and TRS administrator.[109]  In addition, we require VRS providers to notify the TRS Fund administrator within one business day after a registered enterprise or public videophone is removed or permanently disconnected from VRS.[110]  We conclude that

---

[104] *Id.* at 2483, para. 121.

[105] *See February 2018 TRS-URD Registration Extension Order*, 33 FCC Rcd 2062 (extending by 31 days the 60-day period for submission of VRS user registration data); *Structure and Practices of the Video Relay Service Program; Telecommunications Relay Services for Individuals with Hearing and Speech Disabilities*, CG Docket Nos. 10-51 and 03-123, Order, 33 FCC Rcd 2987 (CGB OMD 2018) (extending the VRS user data submission period for an additional 30 days); Convo Comments at 14 (asserting that 60 days is unreasonable given the "backtracking" needed to identify and register enterprise customers for the Database); Sorenson Comments at 23 (suggesting that 90 days are needed to avoid service gaps).  We reject Sorenson's request to change the 120-day period to 180 days.  *See* Sorenson April 30, 2019 *Ex Parte* (suggesting that six months are needed to register Sorenson's enterprise videophones).  The number of enterprise and public videophones is far fewer than the number of individual registered users for whom registration data had to be uploaded to the Database when the Database was initially activated, and submission of all individual-user registration data was completed within approximately 120 days.

[106] *February 2018 TRS-URD Registration Extension Order*, 33 FCC Rcd at 2064-65, paras. 7-11.

[107] 47 CFR § 64.615(a)(5)(ii)-(iii) (prohibiting providers from registering or seeking compensation for calls from new users that do not pass the Database verification check).

[108] *2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2484, para. 124.  Unusual activity may vary among public and enterprise locations, but may include, among other things, call activity outside the expected hours for the enterprise or public phone location, a substantial increase in call volume over multiple days, repetitive calls to a single telephone number, an influx of incoming calls when calls are typically outgoing, higher than typical call durations for certain calls, and other activities that are atypical of the calling patterns for the enterprise or public phone.  To the extent that VRS providers are aware of innocuous explanations for atypical calling patterns, *see* Sorenson April 30, 2019 *Ex Parte* at 4, VRS providers can include such explanations in their reports.

[109] *See* 47 CFR § 64.604(c)(13)(i), (iii).

[110] The Commission's original proposal was to require such notice within 24 hours of a videophone's termination.  *2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2484, para. 124.  Convo comments that if the Database accepts new information only during limited hours and days of the week, it may not always be possible to notify the TRS Fund administrator within 24 hours.  Convo Comments at 14.  Our modification to require notice within one business day resolves this concern.  Apart from this timing issue, no party objected to providing either of these notices.

the collection of this information is necessary to prevent waste, fraud, and abuse, given that enterprise and public videophones are available for use by multiple individuals.

### C.    Prohibiting Non-Service Related Inducements

33.    We adopt the Commission's proposal to prohibit VRS providers from offering or providing non-service related inducements that are intended to entice consumers to sign up for or use a VRS provider's service.  Specifically, we adopt a new rule prohibiting VRS providers from offering or providing, to any individual or entity, any form of direct or indirect incentives, financial or otherwise, whether express or implied,[111] for the purpose of encouraging individuals to register for or use a VRS provider's service.  All VRS providers support such a prohibition, although some seek guidance from the Commission on the scope of covered activities and products.[112]  Consumer Groups oppose the proposed prohibition.[113]

34.    The existing prohibitions on the offering of financial or other incentives by TRS providers are aimed largely at practices that encourage wasteful use of relay services, such as incentives for new users to sign up for a service regardless of actual need[114] or for existing users to make calls that they might not ordinarily make.[115]  Because the TRS Fund, not the consumer, pays for the cost of TRS, such practices increase the costs borne by all providers and users of voice communications service, with no commensurate public benefit, and thereby impede the statutory goal of making functionally equivalent service available in the most efficient manner.

35.    The rule amendment we adopt in this Report and Order addresses a variation on this general theme—sign-up incentives aimed primarily at inducing current VRS users to switch (or refrain from switching) providers, rather than recruiting entirely new users.[116]  Like other inducements prohibited by our rules, such incentives undermine the achievement of statutory objectives, albeit in a more indirect fashion.  Competition among providers to offer sign-up inducements tends to increase VRS costs without improving the quality of service, impairing providers' ability and incentive to compete on service quality.[117]  For example, give-aways that contribute nothing to the provider's quality of service not only divert provider resources from the provision of functionally equivalent service, but also encourage consumers to select a provider based on the value of such free offers rather than the service provided,

---

[111] *See* GlobalVRS Comments at 12 (including implied incentives in its proposed definition).

[112] *See* Convo Comments at 16; GlobalVRS Comments at 12-13; Sorenson Comments at 33-34; ZVRS Comments at 2-6; Sorenson Reply Comments at 21-23; ZVRS Reply Comments at 9-10.

[113] *See* Consumer Groups Comments at 9-10 (supporting all types of marketing and outreach by VRS providers and suggesting instead that non-service related inducements should be omitted from reimbursable expenses).

[114] 47 CFR § 64.604(c)(13)(iv) (prohibiting practices that the provider has reason to know will cause or encourage the use of VRS by persons who do not need the service in order to communicate in a functionally equivalent manner); *see also 2013 IP CTS Reform Order*, 28 FCC Rcd at 13428-35, paras. 16-29 (adopting a ban on similar practices by IP CTS providers).

[115] 47 CFR § 64.604(c)(13)(iii); *see also 2005 Financial Incentives Declaratory Ruling*, 20 FCC Rcd at 1468-69, paras. 6, 8; *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket No. 03-123, CC Docket Nos. 98-67 and 90-67, Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking, 19 FCC Rcd 12475, 12480-81, para. 4 & n.23 (2004); *Call Handling Public Notice*, 20 FCC Rcd at 1473.

[116] Incentives aimed at recruiting new VRS users are prohibited by the current rule to the extent that they encourage use of the service by individuals who do not need it for functional equivalence.  47 CFR § 64.604(c)(13)(iv).

[117] *See* Convo Comments at 16; GlobalVRS Comments at 12; ZVRS Comments at 2-4; GlobalVRS Reply Comments at 4-5.

thereby reducing providers' incentives to improve service quality.[118] Thus, such give-aways undermine the statutory objective even though their cost may not be recovered directly from the TRS Fund. Indeed, TRS becomes no longer simply a means for the consumer to obtain functionally equivalent telephone service, but rather an opportunity for financial gain because the consumer may choose a provider just to take advantage of its offer of a free item.[119] To prevent these harms, we conclude that it would be insufficient to simply reaffirm that such give-aways cannot be supported by the TRS Fund as an allowable cost. Despite their non-allowability, such give-aways continue to be offered in the competition to attract additional users and minutes. While the Commission historically has sought to enable competition in the provision of VRS, its purpose has been "to allow VRS users to choose among providers who compete on factors such as quality of service, customer service, and technological development" rather than to promote competition as an end in itself.[120] Further, to the extent that inducements to choose a particular provider are offered selectively to relatively high volume users (or to consumers perceived as such), they are likely to increase the cost burden on the TRS Fund, by generating a perverse incentive for users to make calls that otherwise would not be made.[121] In the context of a service supported by the TRS Fund, the record does not disclose any benefit from non-service-related incentives that could conceivably offset the harms described above.[122]

    36.    The inducements we prohibit are not limited to loyalty programs, user appreciation awards, charitable donations and other incentives to increase VRS usage,[123] but also include non-service-related give-aways, such as video game systems,[124] that reward or entice users to register for or use a

---

[118] *See* Convo Comments at 16. Expenditures on such inducements may also reduce providers' incentive and ability to develop new TRS technologies, undermining our mandate to ensure that our rules do not discourage or impair such development. *See* 47 U.S.C. § 225(d)(2).

[119] *See 2007 TRS Rate Methodology Order*, 22 FCC Rcd at 20173, para. 90 n.235 (citing *2005 Financial Incentives Declaratory Ruling*, 20 FCC Rcd at 1469, para. 8).

[120] *2013 VRS Reform Order*, 28 FCC Rcd at 8622, para. 5.

[121] *See 2005 Financial Incentives Declaratory Ruling*, 20 FCC Rcd at 1469, paras. 7- 8 (noting that in these situations, "[a]s a practical matter, the TRS provider is enticing the consumer to make TRS calls that will artificially raise costs to the Interstate TRS Fund").

[122] As noted above, all VRS providers, large and small alike, support the proposed restriction. While opposing the restriction, the Consumer Groups do not identify any specific public benefits from non-service-related give-aways. Consumer Groups at 9-10.

[123] This rule is not intended to discourage charitable donations or sponsorships to entities that may use VRS, so long as those donations are not directly or indirectly tied to the use of VRS or the selection of a VRS provider. *See Schools and Libraries Universal Service Support Mechanism*; *A National Broadband Plan for Our Future*, CC Docket No. 02-6, GN Docket No. 09-51, Order, 25 FCC Rcd 17324, 17327-28, paras. 10-11 (2010) (detailing the permissibility of charitable donations under the E-rate gift rules, which permits such donations so long as intent of the gift is not to influence the E-rate competitive bidding process).

[124] The Consumer Groups argue that video game give-aways should not be prohibited because "VRS may be an integral component of the video game experience much like a chat room is for hearing video gamers." Consumer Groups Comments at 10. The purpose of section 225 is to provide services that are functionally equivalent to voice communication services. As far as the Commission is aware, the vast majority of VRS calls are for communications that are unrelated to video games and do not require video game equipment to complete such calls. Therefore, we conclude that giveaways of video gaming systems cannot be justified as service related. We believe that this clarification sufficiently addresses the issues raised in the ex partes regarding ZVRS' "OneVP" device, which reportedly can be used for multiple purposes in addition to VRS, including but not limited to video gaming. *See* Letter from Gregory Hlibok, Chief Legal Officer, ZVRS Holding Company, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 10-51 and 03-123, at 2 (filed May 2, 2019) (ZVRS May 2, 2019 *Ex Parte*). To the extent that further clarification is desired regarding a particular type of free offering, parties may request such clarification from the Commission.

particular provider's VRS.[125]  We conclude that this approach builds upon the Commission's earlier financial incentives rulings in ways that account for the particular harms to statutory goals and TRS policies arising from these types of incentives.[126]  We agree with GlobalVRS that where a consumer device is given out to induce users to switch default providers, or stay with their current provider, and is not the type of device ordinarily needed or used to place a VRS call, it should be prohibited.[127]  In determining whether a free give-away constitutes a non-service related inducement, the Commission will consider, among other things, the extent to which the equipment is designed, marketed, and used for relay communication.[128]  We invite providers that are uncertain about the permissibility of giving away a particular device to seek guidance from the Commission prior to engaging in such activity.[129]

37.      Although this new rule does not cover providing VRS-related items, such as videophones and video monitors, at no or minimal charge, we note that the Commission's existing rule prohibiting VRS provider practices that improperly stimulate VRS usage necessarily encompasses the practice of providing VRS-related equipment at no or minimal charge to select users based on their actual or expected volume of VRS minutes.[130]  Because VRS users themselves do not incur any additional cost from placing additional VRS calls, selectively providing VRS-related equipment at no or minimal charge

[125] The prohibition covers inducements to continue using a particular provider as well as inducements to change one's default provider or to dial-around to a particular provider.  We do not prohibit *de minimis* give-aways, such as pens and T-shirts, as we do not believe these rise to the level of an inducement sufficient to entice a consumer to sign up for or use a particular provider's service.  *See* ZVRS Comments at 3-4 (suggesting that the Commission exempt *de minimis* gifts in alignment with the E-rate gifting rule, 47 CFR § 54.503(d)).

[126] *See supra* para. 7 & notes 23-25.  We clarify that the rule we adopt today is not intended to preclude a provider from raising awareness about VRS generally, or to make its service offerings known through marketing and outreach activities, such as the distribution of informational materials, promotional advertising, and technical literature.  *See* GlobalVRS Comments at 12; Sorenson Reply Comments at 22-23; ZVRS Comments at 2-3.

[127] *See* GlobalVRS Reply Comments at 5.  Conversely, we will not, at this time, prohibit the distribution of service-related equipment.  *See* Sorenson Comments at 33-34 (urging the Commission to preserve providers' ability to provide to users at no charge videophones, routers, cables, and TV monitors with built-in speakers for VCO, sufficient picture quality for VRS, and HDMI capability); Sorenson Reply Comments at 21-22.  However, permitting such distribution does not change the Commission's longstanding rule disallowing TRS Fund compensation for the cost of such equipment and its distribution.  *See 2017 VRS Compensation Order*, 32 FCC Rcd at 5897, para. 12.

[128] We do not adopt ZVRS' recommendation that to be permissible as a give-away, equipment should have the ability, on its own, to support VRS service without any ancillary device.  *See* ZVRS Reply Comments at 9-10.  Certain people with disabilities, such as individuals who are deaf-blind, may need auxiliary devices—such as Braille displays—to connect to the distributed equipment in order to meet their accessibility needs.  However, as ZVRS requests, we clarify that our new rule is not intended to discourage innovative VRS provider offerings or products that are intended to enhance the quality or accessibility of relay services.  *See* ZVRS Comments at 5.

[129] *See* 47 CFR §§ 1.2, 1.41.  We decline to establish a 30-day shot clock for the Commission to issue such guidance, as the time needed may depend on many factors, including available staff resources, other business requiring the Commission's attention, and whether the information initially submitted is sufficient to enable a determination.  *See* Sorenson April 30, 2019 *Ex Parte* at 7.

[130] *See* 47 CFR § 64.604(c)(13); *see also supra* para. 7 & note 23.  We decline to adopt Sorenson's last-minute suggestion that we incorporate into the rules explicit criteria for providers to offer service-related equipment.  *See* Letter from John T. Nakahata, Counsel to Sorenson to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 10-51 and 03-123, at 1-2 (filed May 2, 2019) (Sorenson May 2, 2019 *Ex Parte*).  As noted above, the focus of our proposal in this proceeding is on *non-service-related* incentives.  We do not believe it is appropriate in these circumstances to codify standards for service-related equipment in this proceeding.  We also note that Sorenson's proposed rules purporting to interpret past Commission determinations on this separate question neither reference nor clearly align with the language in the Commission determinations.

based on the recipient's level of usage is likely to encourage consumers to increase such usage solely in order to qualify for free or minimal cost equipment. Accordingly, we remind VRS providers that, absent a clear justification, e.g., based on the nature of a particular person's disability, or the launching of a limited-duration opt-in product testing program with clear instruction on participation requirements, the provision of equipment at no or minimal charge to select individuals, whether or not service-related, may be deemed evidence that a provider has violated the rule against practices that cause or encourage the making of VRS calls that would not otherwise be made.

### D. Technical Corrections to the TRS Rules

38. We amend section 64.604(c) of the Commission's rules to correct erroneous cross-references and an incorrect paragraph number. Specifically, the cross-references in the current text of section 64.604(c)(5)(iii)(D), citing provisions of paragraph (C),[131] are corrected to cite the corresponding provisions of paragraph (D). In addition, section 64.604(c)(12), in which the second and third paragraphs are both numbered as (ii), is corrected to change the numbering of the third paragraph from (ii) to (iii).[132]

## IV. FURTHER NOTICE OF PROPOSED RULEMAKING

### A. Permitting At-Home Interpreting on a Permanent Basis

39. We propose to convert the Commission's pilot VRS at-home call-handling program, which allows VRS providers to handle some VRS calls from CA at-home workstations, to a permanent program that will be subject to safeguards designed to maintain service quality, protect call confidentiality, and prevent waste, fraud, and abuse. We believe that taking this action is likely to expand the available pool of qualified sign-language interpreters who can work as VRS interpreters (i.e., CAs) and improve VRS reliability, which will advance the Commission's goal of ensuring a high quality, functionally equivalent VRS program in furtherance of the objectives of section 225 of the Communications Act.[133]

40. Over the past year, VRS providers participating in the pilot at-home call-handling program have been required to submit reports detailing information about their at-home call handling.[134] Based on these reports, we believe that this pilot has demonstrated that the benefits anticipated by the Commission in the *2017 VRS Improvements Order* are being realized. Specifically, the reports indicate that allowing CAs to work at home has enabled providers to attract and retain qualified CAs for whom working at the companies' call centers is not a practical option, and has improved working conditions and productivity of CAs working at home.[135] In addition, allowing at-home call handling can improve

---

[131] *See* 47 CFR § 64.604(c)(5)(iii)(D)(*2*) (cross-referencing paragraph (C)(*1*)), (*3*) (cross-referencing paragraph (C)(*2*)), (*4*) (cross-referencing paragraphs (C)(*2*) and (*3*)).

[132] We find good cause for making these corrections without prior notice and comment. The cross-references in section 64.604(c)(5)(iii)(D) are clearly inaccurate and in context with the accompanying text it is apparent they should refer to provisions of paragraph (D) rather than paragraph (C). It is equally apparent that the numbering within section 64.604(c)(12) is incorrect. We thus conclude that notice and comment are unnecessary to make these inconsequential changes. 5 U.S.C. § 553(b)(B).

[133] 47 U.S.C. § 225(a)(1), (b)(1).

[134] *Id*. § 64.604(b)(8)(viii), (ix).

[135] *See 2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2457, para. 50 (describing expected benefits); *Pilot Program Extension Order*, para. 6 (describing evidence that the expected benefits have been realized under the pilot program); ZVRS/Purple Petition at 6-7 (stating that "several interpreters who cannot travel to one of the Companies' traditional call centers due to a lack of proximity or inadequate public transportation options are now successfully handling VRS calls at their at-home workstations"); *id*. at 8, 13-14 (interpreters working at home report reduced stress); *see also Second Pilot Program Extension Order* at 4-5, paras. 7-8 (citing provider-reported data indicating that the average at-home CA handles more calls daily and receives a comparable or lower ratio of complaints to answered calls than CAs at traditional call centers).

network reliability and redundancy, and has the potential to help providers better respond to calls in accordance with the Commission's speed-of-answer rules when unforeseen circumstances occur, such as inclement weather, civic emergencies, and network outages or congestion.[136]  We seek comment on whether this depiction of these benefits is accurate, and whether other benefits have been realized during the pilot program or are likely to be realized if the program is authorized on a permanent basis.  Are there any disadvantages to making this program permanent?

41.     We also seek comment on whether, and to what extent, a rule change permitting at-home interpreting is likely to reduce or increase the total costs of the VRS program.  Current program participants anticipate a significant net savings in VRS costs if permanent authorization allows the scale of the program to be expanded.[137]  We seek comment on how this would be achieved, and any additional information about costs incurred by participating providers.  For example, costs could include training and supervising CAs, installing facilities and software to serve home workstations, troubleshooting and maintaining security at home workstations, ensuring compliance, and preparing required reports.[138]

42.     We believe that the various safeguards established in the *2017 VRS Improvements FNPRM* as conditions for participation in the pilot program generally have been effective in preventing waste, fraud and abuse, meeting the TRS mandatory minimum standards, and ensuring the confidentiality, reliability, and quality of at-home interpreting.[139]  For example, it is our understanding that during the pilot program, in addition to ensuring redundancy of operations,[140] ZVRS and Purple interpreters have ensured the confidentiality of calls by providing secure environments that are safeguarded from intrusion or interference.[141]  Additionally, supervisors working for these participating providers report that remote supervision technology has enabled them to monitor CA performance, confirm the confidentiality of calls handled, and offer assistance for interpreters working at home as effectively as for those working in call

---

[136]  VRS providers must answer 80 percent of all VRS calls within 120 seconds, measured on a monthly basis.  47 CFR § 64.604(b)(2)(iii).  Enabling interpreters to answer calls from alternative locations, particularly during hours or weather conditions when interpreters are less likely to be able to travel to call centers, can increase the likelihood that a VRS call will be answered as quickly as possible.  *See 2017 VRS Improvements Order*, 32 FCC Rcd at 2457, para. 50; *Pilot Program Extension Order*, 33 FCC Rcd at 11000-01, para. 6; ZVRS/Purple Petition at 14 (stating that at-home interpreting has provided greater flexibility for ZVRS and Purple to adapt to unexpected increases in call volumes by adjusting at-home interpreter schedules); ZVRS/Purple Petition at 14 (claiming that at-home interpreting has increased interpreters' productivity and improved the providers' flexibility to adapt to fluctuations in call volume and unexpected service-disrupting events).

[137]  *See* ZVRS/Purple Petition at 7.

[138]  *See* ZVRS/Purple Petition at 7, Exh. A at 38, Exh. B at 40 (providing confidential estimates of costs incurred for the first six months of the pilot program).  Access to the confidential information submitted by ZVRS and Purple in support of their petition for rulemaking, as well as information submitted by commenting parties in response to this Further Notice, is governed by the Third Protective Order in this docket.  *See Misuse of Internet Protocol (IP) Captioned Telephone Service*; *Structure and Practices of the Video Relay Service Program*; *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket Nos. 13-24, 10-51, and 03-123, Order and Third Protective Order, 33 FCC Rcd 6802 (CGB 2018) (*Third Protective Order*).

[139]  *See Pilot Program Extension Order*, 33 FCC Rcd at 11002-03, para. 10 (summarizing providers' reports indicating that interpreters working at home under the pilot program are meeting minimum TRS standards and complying with at-home call-handling safeguards); ZVRS/Purple Petition at 9-16 (presenting information to show that at-home call handling under the pilot program meets the Commission's expectations regarding effective supervision, confidentiality, reliability, redundancy and high quality of service).

[140]  *See* ZVRS/Purple Petition at 12-13 (explaining that the pilot program has enabled companies to improve redundancy of their networks by distributing call handling functions outside of their traditional call centers).

[141]  *See id.* at 11-12, 15.

centers.[142]  We note as well that during the pilot period, VRS consumers have not reported any difference in call quality to the Commission.[143]  We seek comment on the extent to which the pilot program's safeguards generally have been effective.  In addition, below we list each of these safeguards, and seek comment on the extent to which each should be retained, modified, eliminated or supplemented if the Commission makes this program permanent.  When responding, we urge commenters, especially participating providers, to provide detailed information, including quantitative data to the extent available, in support of their views on whether and how these governing rules should be modified, as well as the costs and benefits of incorporating each into the permanent program.  Further, we seek comment on any differences in call quality between traditional call centers and CAs working from home.

43.     *Personnel Safeguards*.  The pilot program requires CAs working from their homes to have a minimum of three years of VRS experience.[144]  In addition, before allowing a CA to work at home, a VRS provider must:

- Ensure that the CA has sufficient experience, skills, and knowledge to effectively interpret from at-home workstations, including a thorough understanding of the Commission's mandatory minimum standards;

- Provide additional training to CAs to ensure that they understand and follow the provider's protocols for at-home call handling;

- Establish, and provide to the CA in writing, the grounds and process for dismissal from the at-home program if the CA fails to adhere to the Commission's TRS rules, including the specific requirements for at-home call handling; and

- Obtain a written certification from each CA as to their understanding of and commitment to complying with the Commission's TRS rules, and their understanding of the grounds and process for dismissal from the at-home program.[145]

While CAs are working from home, the VRS provider must:

- Provide support equivalent to that provided CAs in call centers, including, where appropriate, the opportunity to team interpret; and

- Ensure that supervisors are readily available to resolve problems that may arise during a relay call.[146]

Are these requirements effective in ensuring that CAs working at home can effectively handle VRS calls or should they be modified in any way?  What, if any, screening, training, and disciplinary issues have been encountered in the pilot program and how have these been addressed?  How should any such issues be dealt with in the Commission's rules?

44.     *Technical and Environmental Safeguards*.  Under the pilot program, VRS providers are required to ensure that at-home workstations enable the provision of confidential and uninterrupted service to the same extent as the provider's call center, and that calls handled by at-home CAs are seamlessly integrated into the provider's call routing, distribution, tracking, and support systems. Specifically, the provider must:

---

[142] *See id*. at 10-11, 12, 15.

[143] *See id*. at 6-8.

[144] 47 CFR § 64.604(b)(8)(iv)(A).

[145] *Id*. § 64.604(b)(8)(iv).

[146] *Id*. § 64.604(b)(8)(iv)(C).

- Require that home workstations be placed in a separate location within the home, with restricted access and effective means to minimize the impact of outside noise and prevent eavesdropping;

- Configure at-home workstations to enable the CA to use all call-handling technology to the same extent as other CAs, including the ability to transition a non-emergency call to an emergency call, engage in virtual teaming with another CA, and allow supervisors to communicate with and oversee calls;

- Ensure that each at-home workstation is capable of supporting VRS in compliance with the Commission's mandatory minimum standards, including the provision of system redundancy and other safeguards to the same degree as at call centers, and including the ability to route VRS calls around individual CA workstations in the event they experience a network outage or other service interruption; and

- Connect workstations to the provider's network over a secure connection to ensure caller privacy.[147]

45.     Are these safeguards sufficient to ensure that CAs working from at-home workstations can provide high-quality, confidential, and uninterrupted service, and if not, what modifications to these requirements are necessary?[148]  What technical and environmental issues have been encountered in the pilot program, how have they affected the integration of calls handled by at-home CAs into the call routing, distribution, tracking and support systems, and how have any such technical challenges been addressed?  How should any such issues be dealt with in the Commission's rules?  Are some of the current safeguards—e.g., the requirement for system redundancy at each workstation, disproportionately burdensome in relation to their value for the stated purpose(s)?

46.     *Monitoring and Oversight Requirements.*  To ensure that providers appropriately monitor and oversee the at-home call handling pilot program, they have been required to:

- Inspect and approve each at-home workstation before activating a CA's workstation for use;

- Equip each at-home workstation with monitoring technology sufficient to ensure that off-site supervision approximates the level of supervision at the provider's call center, including the ability to monitor both ends of a call, i.e., video and audio, to the same extent as is possible in a call center, and regularly analyze any data collected to proactively address possible waste, fraud, and abuse;

- Conduct random, unannounced inspections of at least five percent (5%) of all at-home workstations per year; and

- Keep all records pertaining to at-home workstations, including the data produced by any at-home workstation monitoring technology, except for any data that records the content of an interpreted conversation, for a minimum of three years.[149]

47.     Do these monitoring and oversight requirements enable VRS providers to appropriately supervise the CAs working at home?[150]  What monitoring and oversight issues have been encountered in the pilot program and how have they been addressed?  Which requirements were found to be most useful

---

[147] *Id*. § 64.604(b)(8)(v).

[148] *See* ZVRS/Purple Petition at 11-15 (providing evidence regarding confidentiality, redundancy, reliability, and quality of service).

[149] 47 CFR § 64.604(b)(8)(vi); *2017 VRS Improvements Order*, 32 FCC Rcd at 2460-61, para. 54.

[150] See ZVRS/Purple Petition at 9-11 (describing reported efficacy of supervision of interpreters working at home).

to ensure effective supervision of CAs?  We note that under a permanent program, the number of at-home workstations is likely to increase.  To what extent is this likely to increase the risk that individual CA workstations may fall short of full compliance with technical, environmental, and privacy safeguards?  To ensure that providers detect and promptly address any such compliance issues, should the Commission increase the required annual percentage of at-home workstations that must be subject to random, unannounced provider inspections – for example to 10 or 15% of a provider's at-home workstations each year?  What are the costs and benefits of adopting this requirement?

48.      In addition to compliance with the above safeguards, during the pilot program, at-home workstations and workstation records must be available for review, audit, and unannounced inspections by the Commission and the TRS Fund administrator to the same extent as VRS call centers.[151]  We propose that, if made permanent, at-home workstations and records continue to be subject to such inspections to the same extent as regular call centers.  We seek comment on this proposal.

49.      *Authorization to Participate in the At-Home Call Handling Program*.  To participate in the pilot program, each VRS provider was required to submit a detailed plan containing the following, to demonstrate its ability to achieve full compliance with the above safeguards and the Commission's mandatory minimum TRS standards:[152]

- A description of the provider's at-home CA screening and training process, the protocols and expectations established for CAs working at home, and the grounds and process for dismissing a CA from the at-home program;

- All steps that the provider would take to install a workstation in a CA's home, including an evaluation to ensure the workstation was sufficiently secure and equipped to prevent eavesdropping and outside interruptions;

- A description of the monitoring technology to be used to ensure that off-site supervision approximated the level of supervision at the provider's call center;

- An explanation of how the provider's workstations would connect to the provider's network, including how these would be integrated into the call center routing, distribution, tracking, and support systems, and how the provider would ensure system redundancy in the event of service disruptions in at-home workstations;

- A signed certification by an officer of the provider affirming that the provider would conduct random and unannounced inspections of at least five percent (5%) of all at-home workstations during the year; and

- A commitment to comply with all other at-home call-handling safeguards and TRS rules.[153]

50.      To what extent should providers be required to provide the same level of detailed information, certification, and commitment, if at-home call handling is permitted on a permanent basis?  Is any of the required information no longer necessary or disproportionately burdensome to its value in ensuring high-quality call handling and preventing fraud, waste, and abuse?  What, if any, additional information should be collected to help the Commission maintain call quality and prevent fraud, waste, and abuse?

---

[151] 47 CFR § 64.604(b)(8)(vii).

[152] *Id*. § 64.604(b)(8)(i); *2017 VRS Improvements Order*, 32 FCC Rcd at 2461-62, para. 55-56.

[153] 47 CFR § 64.604(b)(8)(i).

51.    We note that under the pilot program, Commission approval for participation can be canceled at any time if the provider fails to maintain compliance.[154]  We propose that the Commission retain such option, and seek comment on this approach.

52.    *Data Collection Requirements*.  For calls handled at home workstations, the pilot program rules have required VRS providers to submit the following data in their monthly requests for compensation, in addition to the data otherwise required to receive payment for handling calls:

- A unique call center identification number (ID), street address, and CA ID for each CA working at home; and

- The location and call center IDs of call centers providing supervision for at-home workstations, and the names of persons at such call centers responsible for oversight of these workstations.[155]

In addition, the *2017 VRS Improvement Order* directed providers to submit a six-month implementation report that includes:

- A description of the screening process used to select CAs who may work from home;

- Copies of training materials and written protocols for at-home CAs;

- The total number of CAs who have worked at home during the reporting period;

- The total number of 911 calls handled during the reporting period;

- A description and copies of any survey results or self-evaluations concerning CAs' experience handling calls at home;

- The total number of CAs terminated from the program;

- The total number of complaints, if any, submitted to the provider regarding its at-home call-handling program or calls handled by at-home CAs; and

- The total number of on-site inspections of at-home workstations conducted, along with the dates and locations of such inspections.[156]

53.    To what extent is the information required in monthly reports sufficient to support compensation requests and protect against waste, fraud, and abuse?  Should the Commission continue to require VRS providers to submit such information as well as implementation reports at six-month intervals?  If so, should these information reporting requirements be retained, modified, eliminated, or supplemented in any manner?  Should any reported information be made available to the public?  For example, if a VRS provider takes a survey of its CAs concerning their participation in the at-home VRS call handling program, could the aggregated responses be made public, as long as identifying information for CAs and respondents is redacted?

54.    *Limitation on Service*.  We propose to increase or remove the pilot program's 30 percent limit on a provider's at-home call-handling minutes.[157]  The Commission established this limitation—

---

[154] *Id*. § 64.604(b)(8)(ii).

[155] *Id*. § 64.604(b)(8)(viii).

[156] 47 CFR § 64.604(b)(8)(ix) (requiring a report on the first six months of the pilot program); *see also Pilot Program Extension Order*, 33 FCC Rcd at 11004, para. 13 (in conjunction with the extension of the pilot program, adding a second six-month report and a further report covering the first three months of the six-month extension period).  The first six-month reports were due and received on June 1, 2018.  The second six-month reports were due and received on December 3, 2018, and the three-month reports were due and received on March 1, 2019.

[157] 47 CFR § 64.604(b)(8)(iii); *2017 VRS Improvements Order*, 32 FCC Rcd at 2455-56, para. 46.

which has ensured that VRS providers process more than twice as many minutes at call centers as at home workstations—to provide an opportunity to evaluate the success of the program without significant risk to providers' operations, consumer satisfaction, or the TRS Fund.[158]  Our proposal to authorize at-home call handling permanently is premised on our belief that, based on the pilot program results, VRS calls can be handled at home workstations, subject to the safeguards discussed above, without significantly increasing the risk of waste, fraud, and abuse or otherwise impeding the objectives of section 225.  Increasing the limit would allow each provider greater scope to make its own determination on the extent to which it can efficiently make use of at-home call handling while remaining in compliance with our minimum TRS standards.  We seek comment on the costs and benefits of this proposal and on whether the limit should be retained at a higher level, e.g., 50 percent, or removed entirely.  For example, could the limit be completely removed without significantly increasing the risk of fraud or abuse, in reliance on the safeguards described above?

### B.    Providing Service to New and Porting Users Pending TRS-URD Verification

55.    To eliminate unnecessary inconvenience to VRS registrants, without a significant increase in the risk of waste, fraud, and abuse, and in response to a petition by the five currently certified VRS providers, we propose to allow VRS providers to provide service to new and porting users for up to two weeks pending the completion of identity verification.  We believe this change would be helpful to ensure that service to new and porting VRS users can be commenced efficiently and without undue delay or disruption of service, in order to facilitate competition and ensure the functional equivalence of this service.  Compensation for calls placed or received by the user during this period would be paid only if the user's identity is ultimately verified.

56.    As noted by the VRS providers, identity verification for most users is completed within hours of data submission to the User Database, but for some users, verification can take longer, e.g., due to technical problems or because the user's identity cannot be verified without the submission of additional information.[159]  Under the proposed rule change, a consumer would not be subjected to a delay in commencement of service as a result of verification issues that are often beyond the consumer's control.[160]

57.    Under this proposal, VRS providers could assign a telephone number and begin service to a new or porting user immediately after registration.[161]  This telephone number would be entered in the TRS Numbering Directory on a temporary basis so that VRS calls (as well as point-to-point calls) may be placed to and from the number, either through the default provider or on a dial-around basis.[162]  In the event that the user's identity is not verified within the two-week period, the number would be removed from the Numbering Directory.  We believe that any resulting risk of waste, fraud, or abuse is minimal

---

[158] *2017 VRS Improvements Order*, 32 FCC Rcd at 2455, n.130. At the same time, the 30 percent ceiling was deemed high enough to leave significant flexibility for providers to increase at-home call handling during night-time hours.  *Id*.

[159] VRS Providers Petition at 7-8.

[160] *See id*. at 8.

[161] *See id*. at 9, 11.  For porting users, the number assigned could be a temporary number, if the user does not wish to port his or her permanent number until after identity verification is completed.

[162] If a dial-around call is attempted, the VRS provider processing the call would be able to determine whether the user has been verified or is placing a pre-verification call, by using the "all call query" (per-call validation) function of the Database and the TRS Numbering Directory.  *See id*. at 8.  VRS providers would not be *required* to handle dial-around calls placed prior to verification, and those choosing to do so would accept the risk that compensation would not be paid if the user's identity is not verified within the maximum two-week period.

because, under our proposal, no compensation may be requested or paid until the user's identity has been verified.[163]  We seek comment on the costs and benefits of this proposal.

### C.    Requiring Enterprise and Public Videophone Log-In Procedures

#### 1.    Introduction

58.    We seek further comment on the Commission's proposal in the 2017 *VRS Improvements FNPRM* to require default VRS providers to implement log-in procedures for individuals using enterprise and public videophones for VRS calls.[164]  Although some commenters question whether a log-in requirement is necessary,[165] as stewards of the TRS Fund, we believe a log-in procedure is needed to safeguard the TRS program from waste, fraud, and abuse, including specific patterns of fraud and abuse that have plagued it in the past, the success of which often depended on the user's identity (or the absence of any actual user) remaining secret.[166]  To this end, the Commission previously adopted a series of safeguards, including the establishment of a centralized database (the TRS-URD) to verify the identity of VRS users,[167] call validation requirements to ensure that VRS calls involve properly registered users,[168] and call detail reporting requirements to confirm the identity of VRS callers and that the provider is in fact entitled to compensation for the call.[169]  These safeguards, however, may be less effective when VRS calls are made to or from enterprise and public videophones, because there is no record identifying the actual user of the videophone.  As the success of fraudulent activity often depends on the perpetrators remaining anonymous, we believe user log-in is needed to help prevent the recurrence of waste, fraud, and abuse by ensuring that enterprise and public videophones are actually used only by registered VRS users.

59.    We clarify that, under the proposed log-in rule, VRS calls made to or from an enterprise or public videophone will be compensable only if:  (1) the individual using the videophone is a registered VRS user; (2) before placing or receiving the call, the user provides a log-in code, consisting of the user's NANP telephone number and a personal identification number (PIN) or password,[170] which the VRS

---

[163] *See id*. at 10, 12-13.

[164] *2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2482-83, paras. 119-20.

[165] *See* Letter from Danielle Burt and Tamar Finn, Counsels for Telecommunications for the Deaf and Hard of Hearing, Inc., to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 10-51 and 03-123, at 1-2 (filed Feb. 20, 2018) (Consumer Groups February 20, 2018 *Ex Parte*); Letter from John T. Nakahata, Counsel to Sorenson, to Marlene H. Dortch, FCC, Secretary, CC Docket Nos. 10-51 and 03-123, at 2-3 (filed Jan. 26, 2018) (Sorenson January 26, 2018 *Ex Parte*); Letter from Gregory Hlibok, Chief Legal Officer, ZVRS Holding Company, to Marlene H. Dortch, FCC, Secretary, CC Docket Nos. 10-51 and 03-123 (filed Feb. 7, 2018) (confidential) (ZVRS February 7, 2018 *Ex Parte*).

[166] Beginning in 2009, investigations by the U.S. Department of Justice, the Commission, and its Office of the Inspector General uncovered a wide range of illicit VRS-related activities, generally involving the arrangement of illegitimate VRS calls to generate per-minute compensation for the VRS provider involved.  The types of fraudulent calls discovered included, for example, voice-to-voice calls that were processed and billed as relay calls, calls where the connection was left open without any communication occurring, use of "double privacy screens" that completely blocked video displays, making communication impossible, and CAs calling themselves.  Generally, individuals who made these calls were paid to do so by the providers engaged in these illicit schemes.  *See 2011 VRS Call Practices Order*, 26 FCC Rcd at 5549-51, para. 4; *see also 2013 VRS Reform Order*, 28 FCC Rcd at 8620, para. 1.  The lack of safeguards to confirm the identities of VRS users made these types of fraud more difficult to detect.

[167] *2013 VRS Reform Order*, 28 FCC Rcd at 8647-56, paras. 62-86; 47 CFR §§ 64.601(a)(40), 64.615(a)(5).

[168] *2013 VRS Reform Order*, 28 FCC Rcd at 8651, para. 72; 47 CFR § 64.615(a)(1).

[169] *2011 VRS Call Practices Order*, 26 FCC Rcd at 5585, para. 87.

[170]  The user can request such a PIN or password from his or her default VRS provider at the time of registration or any time thereafter.  The necessary log-in information and format will be determined by the TRS Numbering

(continued….)

**Federal Communications Commission**                    **FCC 19-39**

provider then validates through a prescribed procedure; and (3) the VRS provider includes the user's telephone number, as well as other information reasonably requested by the TRS Fund administrator, in the call detail records (CDRs) submitted to the TRS Fund administrator with the provider's request for compensation.[171]  We seek further comment on this proposal, including the proposed log-in procedure detailed below.

60.    As a related matter, because the proposed log-in procedure will limit access to enterprise and public videophones to registered VRS users, we seek comment on whether to revise the certification requirement for enterprise videophones adopted in the Report and Order, so as to be consistent with the restriction to registered users.[172]  Specifically, should we require VRS providers to submit to the User Registration Database a certification by the responsible individual for an enterprise videophone that the organization, business, or agency will make reasonable efforts to ensure that only registered VRS users are permitted to use the phone for VRS?

61.    Although some commenters claim that public videophones are relatively infrequently used, Rolka Loube reports that total usage of enterprise and public videophones averages more than one million minutes per month.  We believe this degree of usage is sufficient to justify imposing a log-in requirement to help prevent the recurrence of significant VRS fraud.  We seek comment on our assumptions and Rolka Loube's estimates of enterprise and public videophone usage.

62.    Others argue that a log-in requirement would conflict with functional equivalency, burden consumers, and hinder effective communication, noting that some public videophone users are not registered, while others may have difficulty remembering a PIN.[173]  We believe that any burden imposed on users by the log-in requirement would be minor compared to its substantial benefit in preventing the misuse of enterprise and public videophones.[174]  Individuals use log-ins regularly to access smartphones, voicemail, and email, as well as work, school, and personal computers, and commercial, retail, and financial accounts.  To use such devices and services, consumers routinely need to remember (or store in a retrievable location) usernames, passwords, and PINs.  Further, consumers would not need to remember separate telephone numbers and PINs for each VRS provider,[175] as once a user obtains a telephone number and PIN from one provider, that log-in information may be used to place a VRS call from any enterprise or public videophone.  We seek comment on these assumptions.  We also seek comment on the cost to the VRS providers of having to provide a PIN reset service if this proposal is adopted.

---

(Continued from previous page) ───────────────

Administrator, in consultation with the Database administrator and the Commission.  Individuals who have not previously registered for VRS must do so before they can make VRS calls at enterprise or public videophones.

[171] The Commission has ruled that the privacy protections contained under the CPNI rules apply to data contained in CDRs.  *See* 47 CFR §§ 64.5101-5111.

[172] *See supra* para. 29 (requiring VRS providers to submit a certification from the individual responsible for an enterprise videophone that the organization, business, or agency will make reasonable efforts to ensure that only persons with a hearing or speech disability are permitted to use the phone for VRS).

[173] *See* Consumer Groups Comments at 6 (raising concerns that users may not have their numbers and PINs readily available and may need to change the PIN frequently); Convo Comments at 12 (claiming that some users already have difficulty remembering their VRS telephone number and the addition of a PIN would add to that burden); GlobalVRS Comments at 9; Sorenson Comments at 19-23; ZVRS Comments at 10-11; ZVRS Reply Comments at 11-13; *see also* Consumer Groups February 20, 2018 *Ex Parte* at 1-2.

[174] We do not believe that the log-in procedure is a "solution to a problem that does not exist," as claimed by Sorenson.  *See* Letter from John T. Nakahata, Counsel to Sorenson, to Marlene H. Dortch, FCC, Secretary, CC Docket Nos. 10-51 and 03-123, at 1 (filed Nov. 30, 2017) (Sorenson November 30, 2017 *Ex Parte*).  Nonetheless, we seek comment on the assumptions underlying our proposals in this regard.

[175] *See* Convo Comments at 12; Sorenson Comments at 20-21.

## 2. Neustar's Log-In Procedure Proposal

63. In an *ex parte* submission, Neustar, the TRS Numbering Administrator, explains that online log-in systems are common and suggests that providers could use the widely relied-upon OAuth standard to implement log-in functionality.[176] OAuth allows one party (in this case the default VRS provider for an enterprise or public videophone) to request another party (in this case the default VRS provider for the individual using the videophone) to authenticate a person's authorization for them, without the first party learning the identity or credentials of that person.[177] In the current context, OAuth might be applied as follows: when a VRS user enters a telephone number and PIN at an enterprise or public videophone, the default VRS provider serving the videophone checks the TRS Numbering Directory to determine the user's default VRS provider for that number, and sends the telephone number and PIN to that provider; if authentication is positive, the user's default VRS provider transmits a token that allows the user to place or receive a VRS call at the videophone.[178]

64. Responding to provider concerns about the cost and feasibility of a log-in requirement,[179] Neustar asserts that the cost and effort to develop an OAuth-based log-in feature would be reasonable and that development could be completed within six months.[180] Neustar explains that many providers already utilize a username/password capability that could be extended to OAuth, and that even for providers who currently lack such a capability, the availability of open source code means that the cost of implementing OAuth servers and username/password capability will be modest. We therefore tentatively conclude that the benefits of adopting a login requirement would far exceed the minimal costs of implementing it.

65. If the VRS industry implements OAuth, we believe that would enable enterprise OAuth integrations which would allow for an enterprise user to provide the VRS telephone number and log in with the user's enterprise credentials, and the enterprise would attest to the VRS provider that an authorized user has logged in. However, some providers have raised concerns about the technical feasibility and costs associated with implementing an OAuth-based log-in solution.[181] We seek comment

---

[176] *See* Letter from Richard L. Fruchterman, III, Senior External Affairs Counsel, Neustar, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 10-51 and 03-123, at 1-2 (filed Nov. 15, 2017) (Neustar November 2017 Letter). OAuth is an open source, standards-based solution. *See* Internet Engineering Task Force (IETF), Request for Comments (RFC) 6749, The OAuth 2.0 Authorization Framework (Oct. 2012), https://tools.ietf.org/html/rfc6749 (OAuth 2.0 Authorization Framework). Providers could develop a standard using the OAuth 2.0 protocol or utilize an existing standard, such as OpenID Connect, which is an interoperable authentication protocol based on the OAuth family of specifications. *See* OpenID, OpenID Connect FAQ and Q&As, http://openid net/connect/faq/ (last visited Sept. 12, 2017).

[177] Neustar November 2017 Letter at 1.

[178] *See* OAuth 2.0 Authorization Framework at 4.

[179] *See* Convo Comments at 12; Sorenson Comments at 22-23 (suggesting that providers would incur significant costs, time, and resources to provide a user interface with a log-in feature); ZVRS Comments at 10 (questioning whether a log-in system is feasible for certain hardware devices currently in use).

[180] *See* Neustar November 2017 Letter at 1-2.

[181] *See* Sorenson November 30, 2017 *Ex Parte*; Letter from John T. Nakahata, Counsel to Sorenson, to Marlene H. Dortch, FCC, Secretary, CC Docket Nos. 10-51 and 03-123 (filed Dec. 22, 2017) (Sorenson December 22, 2017 *Ex Parte*); Letter from John T. Nakahata, Counsel to Sorenson, to Marlene H. Dortch, FCC, Secretary, CC Docket Nos. 10-51 and 03-123, at 2-4 (filed Jan. 22, 2018) (Sorenson January 22, 2018, *Ex Parte*); Sorenson January 26, 2018 *Ex Parte*; Letter from John T. Nakahata, Counsel to Sorenson, to Marlene H. Dortch, FCC, Secretary, CC Docket Nos. 10-51 and 03-123 (filed Mar. 5, 2018) (Sorenson March 5, 2018 *Ex Parte*); ZVRS February 7, 2018 *Ex Parte*; *See* Letter from Richard L. Fruchterman, III, Senior External Affairs Counsel, Neustar, to Marlene H. Dortch, Secretary, FCC, CG Docket Nos. 10-51 and 03-123, at 1 (filed Mar. 5, 2018) (Neustar March 5, 2018 *Ex Parte*) (summarizing a March 1, 2018 *ex parte* meeting with Sorenson and Commission staff and noting that Sorenson expressed concern

(continued….)

on the costs and feasibility of Neustar's proposal and on our tentative conclusion that these costs will be minimal.[182]  What are the estimated costs of implementing an OAuth based log-in solution, including the streamlined version proposed by Neustar, and how would those costs vary by provider?  While Sorenson estimates a cost of "over $1 million" for "creating, testing, and deploying an OAuth authorization server and modifying and testing videophone software,"[183] it fails to support this claim.  We therefore seek cost information regarding this estimate and any updated estimate.  How much of the estimated cost is attributable to an OAuth server and how much is attributable to necessary videophone software modification?  What kinds of videophone software would need to be modified, and why?  What costs would be incurred by other providers?  Are there significant differences in software modification costs for public and enterprise videophones, respectively?

66.     It appears that total implementation costs could be reduced if the Commission exempted certain kinds of videophones from the log-in requirement.  For example, Sorenson claims that that its ntouch videophones were not designed to have an Internet browser and therefore cannot be modified to support a log-in mechanism.[184]  How many unmodifiable ntouch public and enterprise videophones are currently in use, and how much usage is there for such videophones?  How much of the total estimated implementation cost would be saved by exempting them?  Are there other videophones currently used in public and enterprise locations that do not have, and cannot be modified to support, an Internet browser?  How many such videophones are there and how much of the total estimated implementation cost would be saved by exempting them?  How much usage is there of unmodifiable public and enterprise videophones, and would the implementation costs saved justify the increased risk of fraud from continuing to allow unidentified use of such phones?  Would it be more cost effective to implement a log-in solution through VRS software used on third-party equipment, such as a personal computer or wireless device?  To what extent is such third-party equipment with VRS software deployed or deployable for use as enterprise and public videophones?  If we exempt existing videophones that cannot support browser functionality, should we require that, before registering new enterprise and public videophones, the default VRS provider must confirm that such phones have browser functionality and support OAuth log-in capability?  We also seek comment from manufacturers, vendors, and owners of enterprise telephone systems and other non-provider equipment and software used for enterprise and public videophones, regarding the ability of such systems to support log-in capability.

67.     We note that OAuth 2.0 enables devices without browsers or an ability to securely enter passcodes, such as legacy devices in public areas, where people can see what characters a user is typing on a screen, to still have secure authentication.  However, the OAuth 2.0 solution to this problem requires the user to have access to the Internet with a browser.  Is it likely that a user who wants to use a public or semi-public legacy device will have access to the Internet, perhaps on a personal mobile phone; personal or communal tablet; or personal or public workstation or laptop?  If the users who have smartphones, tablets, or laptops can use them to communicate via VRS, are these users making use of public and enterprise videophones?  If not, who is making use of public and enterprise videophones?  In the case of public phones, are the users generally individuals without smartphones, tablets, or laptops?  In the case of

(Continued from previous page) ─────────────
that a streamlined approach to OAuth authentication, suggested by Neustar at the meeting, raised security and user interface concerns that must be resolved before moving forward).

[182] *See* Neustar November 2017 Letter at 2 (recommending that "providers be given six months from the time that Neustar implements the proxy in the iTRS Directory's Customer Test Environment to develop, test and deploy an OAuth based authentication mechanism").

[183] Sorenson November 30, 2017 *Ex Parte* at 3. Sorenson also argues that there will be costs associated with distributing usernames and passwords to users.  *Id.*

[184] *See* Sorenson December 22, 2017 *Ex Parte* at 2-3; Sorenson January 22, 2018 *Ex Parte* at 3-4; Sorenson March 5, 2018 *Ex Parte* 1 (all available web browsers exceed the available free memory in the ntouch videophones).

enterprise phones, are the users generally using the enterprise phones to ensure that their videocalls are made over the communications facilities managed by the enterprise?

68.     Sorenson also claims that there are "significant security vulnerabilities" in OAuth and other third-party authentication applications.[185]  According to the studies cited by Sorenson, however, such vulnerabilities are not caused by OAuth 2.0 itself but by "home-brewed adaptations" in which "the implicit security assumptions and operational requirements . . . are often not clearly documented or well-understood by the 3rd-party mobile app developers."[186]  What specific security issues would providers face in implementing an OAuth-based log-in solution, and what safeguards are available to address such concerns?  Are there alternative log-in solutions that would not raise similar security vulnerability concerns?

69.     To date only Neustar has proposed a log-in solution.  Are there other log-in solutions the Commission should consider?  The OAuth specification is designed for use with HTTP.[187]  Would a session initiation protocol (SIP)-based standard, such as RADIUS[188] or Diameter[189] provide a more cost-effective or secure standard for implementing a log-in solution?  We also propose to establish a common protocol for the log-in procedure to ensure that user log-ins can be quickly authenticated regardless of the user's default provider.[190]  We seek comment on this approach.  Alternatively, should we allow each provider to develop its own log-in protocol rather than require providers to implement a common protocol?  What are the costs and benefits of each alternative approach?  To what extent do providers already use log-in procedures for users to access VRS?[191]  Could such existing log-in procedures be incorporated into a log-in procedure for enterprise and public videophones?

### 3.     Exemptions

70.     We propose and seek comment on the following exemptions from the log-in requirement.

71.     *Point-to-Point calls.*  We propose to exempt point-to-point calls made on enterprise and public videophones because such calls are not billed to the TRS Fund.[192]  How would exempting point-to-

---

[185] Sorenson November 30, 2017 *Ex Parte* at 3; Sorenson March 5, 2018 *Ex Parte* 1; Neustar March 5, 2018 *Ex Parte* at 1 (Sorenson raised security and user interface concerns in response to Neustar's proposal to use a streamlined OAuth authentication that might otherwise be feasible with the ntouch videophones).

[186] Michael Mimoso, *OAuth 2.0 Hack Exposes 1 Billion Mobile Apps to Account Hijacking*, (Nov. 10, 2016) https://threatpost.com/oauth-2-0-hack-exposes-1-billion-mobile-apps-to-account-hijacking/121889/.  Moreover, according to those sources, even where vulnerabilities arise in inferior applications of OAuth 2.0, they can be fixed at a relatively modest cost.  *See* Brian Quick et al., OAuth 2.0 Vulnerability Impact Study at 2 (2016) https://www.sans.edu/downloads/group-project-jan17-2.pdf (estimating a cost of $17,150 to implement a fix in 12 servers where OAuth had been implemented "in a way that created vulnerability"); *see also* Sorenson March 5, 2018 *Ex Parte* 1; Neustar March 5, 2018 *Ex Parte* at 1.

[187] *See* OAuth 2.0 Authorization Framework.

[188] *See* IETF, RFC 2865, Remote Authentication Dial In User Service (RADIUS) (June 2000), https://tools.ietf.org/html/rfc2865.

[189] *See* IETF, RFC 6733, Diameter Base Protocol (Oct. 2012), https://tools.ietf.org/html/rfc6733.

[190] Neustar indicates that in its role as the TRS Numbering administrator it could act as a proxy and direct the OAuth authentication process to the correct VRS provider without revealing the provider's identity to the provider of the enterprise or public videophone.  *See* Neustar November 2017 Letter at 1-2; *see also* OAuth 2.0 Authorization Framework (detailing the authentication process using a proxy).

[191] *See* Neustar November 2017 Letter at 1-2.

[192] *See* Consumer Groups Comments at 5-6; Sorenson Comments at 20.

point calls affect the implementation of a log-in procedure? At what point in the call process should a user be prompted to log-in to complete a VRS call on an enterprise or public videophone?

72.    *Limited user enterprise videophones.* As initially proposed in the *2017 VRS Improvements FNPRM*, where an enterprise videophone is located within a private workspace or a private room within a long-term health care facility, we propose to allow the VRS provider to permit one registered VRS user to log in a single time and thereafter to continue using the videophone without repeated log-ins, so long as that user continues to be eligible and registered for VRS.[193] In addition, we propose to broaden this proposed log-in exemption to allow relatively convenient access to shared enterprise devices,[194] while limiting usage of the device to registered VRS users. For enterprise videophones at reception desks or other work areas in places of employment, we propose to allow up to five registered users to be simultaneously logged in to a videophone, provided that the phone is configured so that each user must select his or her user profile before placing or answering a VRS call.[195] To limit misuse of this exemption, we propose to require VRS providers to keep records of users that are pre-authorized under each of these exceptions and to discontinue permission for such automatic use by any individual that the provider knows or has reason to believe no longer needs access to the device.[196] What are the associated costs, benefits, and technical concerns?

73.    *Emergency calls and situations.* We also propose to exempt 911 calls from the log-in requirement, so that providers may complete emergency calls from enterprise and public videophones at any time and without delay.[197] We seek comment on this proposal. Are there technical concerns with implementing a log-in exemption for calls to 911?

74.    *Emergency Shelters.* Finally, we propose to exempt from the log-in requirement otherwise eligible VRS calls made from public videophones located in emergency shelters and domestic abuse shelters, so long as the registration data provided to the User Database in advance of such use identifies the phone as an emergency or domestic shelter videophone.[198] We believe there may be situations where individuals fleeing their homes may not have made log-in arrangements in advance of an emergency or domestic abuse incident, or may forget to retrieve such information when rushing to a shelter. Providing individuals the ability to establish telephone communications could be vital to their health and safety in crisis situations. We seek comment on this proposal. Are there other locations where the Commission should adopt an emergency situation exemption to the log-in requirement for enterprise and public phones? How should we define the scope of exempt locations for this purpose?

### 4.    Alternatives to a Log-In Requirement

75.    We also ask for comment on alternatives to a log-in requirement. For example, Sorenson argues that, once enterprise and public videophones are registered in the User Database, it should be sufficient for a VRS user to enter the user's VRS telephone number (without a PIN) before completing a

---

[193] *See 2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2483, para. 120.

[194] Sorenson Comments at 21-22 (providing the example of a school's front desk, where multiple employees might answer the phone at different times).

[195] *See* Neustar November 2017 Letter at 2 n.2 (indicating devices could be set up to allow log-ins from a limited set of users).

[196] In addition, as is true for all VRS calls, VRS providers may decline to handle a call from an enterprise or public videophone if it has reason to believe that someone other than those users who have been preauthorized to use the phone without a per-use log-in is utilizing the device.

[197] Similarly, the Commission has exempted other 911 VRS calls from the per-call validation requirement. *See* 47 CFR § 64.615(a)(1). As with all 911 VRS calls, providers handling such calls must comply with applicable rules regarding the routing of such calls and the transmission of location and callback information. 47 CFR § 64.605.

[198] *See supra* para. 28.

call, noting that the TRS Fund administrator would have the ability to monitor usage trends at these phones to identify anomalous call patterns that may require further investigation.[199]  Sorenson also states that it requires all users who place a VRS call from a public phone to digitally sign to indicate that they have a hearing or speech disability and need VRS to communicate.[200]  Sorenson's certification states:

> By clicking the "Accept," you certify that you have a hearing or speech disability and that you need VRS to be able to communicate with other people.  You further certify that you understand that the cost of VRS calls is paid for by contributions from other telecommunications users to the interstate Telecommunications Relay Service Fund.[201]

76.     Sorenson also proposes that the person responsible for compliant use of the enterprise or public videophone self-certify their status as the responsible person on a quarterly basis.[202]  We seek comment on Sorenson's proposals and invite commenters to propose other alternatives.  We ask commenters to address the costs and benefits of each alternative, including the extent to which such alternatives will protect the TRS Fund from waste, fraud, and abuse.

### D.     Additional Technical Correction of the Data Collection Rule

77.     We propose a further technical correction of section 64.604(c)(5)(iii)(D) of the Commission's rules, which addresses requirements imposed on TRS providers generally regarding data collection and audits.[203]  When the Commission amended this provision (then designated as section 64.604(c)(5)(iii)(C)) in 2011, it appears that a portion of the text of paragraph (*1*) was inadvertently deleted.[204]  Accordingly, we propose to amend paragraph (*1*) to restore the missing text, to read as follows (with the restored text in bold, underlined type):

> TRS providers seeking compensation from the TRS Fund shall provide the administrator with true and adequate data, and other historical, projected and state rate related information reasonably requested to determine the TRS Fund revenue requirements and payments. TRS providers shall provide the administrator with the following: total TRS minutes of use, total interstate TRS minutes of use, **total operating expenses and** total TRS investment in general in accordance with part 32 of this chapter, and other historical or projected information reasonably requested by the administrator for purposes of computing payments and revenue requirements.

---

[199] Sorenson March 5, 2018 *Ex Parte* at 1-2.

[200] Sorenson March 5, 2018 *Ex Parte* at 2.

[201] Letter from Mark D. Davis, Counsel for Sorenson to Marlene Dortch, Secretary, FCC, CG Docket Nos. 10-51 and 03-123, Attach. at 6 (Proposed Self-Certification Language Public-Phone Self-Certification) (filed Mar. 25, 2019) (Sorenson Marc 25, 2019 *Ex Parte*); *see also* Sorenson March 5, 2018 *Ex Parte* at 2 (proposing an earlier version of the language).

[202] Sorenson March 25, 2019 *Ex Parte*, Attach. at 5 (Proposed Self-Certification Language Quarterly User/Supervisor Verification).

[203] 47 CFR § 64.604(c)(5)(iii)(D).

[204] *Compare* 47 CFR § 64.604(c)(5)(iii)(C)(2010) (containing the pre-amendment text) *with 2011 VRS Call Practices Order*, 26 FCC Rcd at 5610, Appx. E (containing the post-amendment text of section 64.604(c)(5)(iii)(C), including paragraph (*1*) thereof, which is marked up to show all the changes to that paragraph *except* the deletion of the words "total operating expenses and").  The *2011 VRS Call Practices Order* does not discuss this deletion or provide any indication that the words were intentionally deleted.

78.    We seek comment on this proposed amendment, which we do not anticipate will have any effect on the current practices of the TRS Fund administrator or TRS providers.

## V.    PROCEDURAL MATTERS

79.    *Final Regulatory Flexibility Analysis.*  As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[205] the Commission has prepared a Final Regulatory Flexibility Analysis (FRFA) relating to this Report and Order.  The FRFA is set forth in Appendix D.

80.    *Initial Regulatory Flexibility Analysis*.  As required by the RFA, the Commission has prepared an Initial Regulatory Flexibility Analysis (IRFA) of the possible significant economic impact on small entities of the policies and rules addressed in this document.[206]  The IRFA is set forth in Appendix E.  Written public comments are requested on this IRFA.  Comments must be identified as responses to the IRFA and must be filed by the deadlines for comments on the Further Notice.  The Commission will send a copy of the Further Notice, including the IRFA, to the Chief Counsel for Advocacy of the Small Business Administration.[207]  In addition, the Further Notice and IRFA (or summaries thereof) will be published in the Federal Register.[208]

81.    *Paperwork Reduction Act Analysis*.  The Report and Order contains new or modified information collection requirements subject to the Paperwork Reduction Act of 1995 (PRA).[209]  It will be submitted to the Office of Management and Budget (OMB) for review under section 3507(d) of the PRA.[210]  OMB, the general public, and other Federal agencies are invited to comment on the new or modified information collection requirements contained in this proceeding.  In addition, we note that pursuant to the Small Business Paperwork Relief Act of 2002,[211] we previously sought specific comment on how the Commission might further reduce the information collection burden for small business concerns with fewer than 25 employees.  In Appendix D, we have assessed the effects of the required collection of information about direct video communications offered by call centers and about enterprise and public videophones.  We find that the requirements are no more burdensome than those currently applicable to VRS providers and are needed to ensure compliance with the Commission's rules and protect against waste, fraud, and abuse of the TRS program.

82.    The Further Notice contains proposed new or modified information collection requirements.  The Commission, as part of its continuing effort to reduce paperwork burdens, invites the general public and OMB to comment on the  information collection requirements contained in the Further Notice, as required by the PRA.[212]  In addition, pursuant to the Small Business Paperwork Relief Act of 2002, we seek specific comment on how we might further reduce the information collection burden for small business concerns with fewer than 25 employees.[213]

---

[205] 5 U.S.C. § 601 *et seq.*

[206] *See id.* § 603.

[207] *See id.* § 603(a).

[208] *Id.*

[209] Pub. L. No. 104-13, 109 Stat 163 (1995) (codified at 44 U.S.C. §§ 3501-3520).

[210] 44 U.S.C. § 3507(d).

[211] Pub. L. No. 107-198, 116 Stat. 729 (2002); 44 U.S.C. § 3506(c)(4).

[212] 44 U.S.C. §§ 3501-3520.

[213] *Id.* § 3506(c)(4).

83.     *Comments.*  Pursuant to sections 1.415 and 1.419 of the Commission's rules,[214] interested parties may file comments on or before the dates indicated on the first page of this document.  Comments may be filed using the Commission's Electronic Comment Filing System (ECFS).[215]

- Electronic Filers:  Comments may be filed electronically using the Internet by accessing the ECFS:  https://www.fcc.gov/ecfs/filings.
- Paper Filers:
   - Parties who choose to file by paper must file an original and one copy of each filing.  If more than one docket or rulemaking number appears in the caption of this proceeding, filers must submit two additional copies for each additional docket or rulemaking number.
   - Filings can be sent by hand or messenger delivery, by commercial overnight courier, or by first-class or overnight U.S. Postal Service mail.  All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission.
   - All hand-delivered or messenger-delivered paper filings for the Commission's Secretary must be delivered to FCC Headquarters at 445 12th St., SW, Room TW-A325, Washington, DC 20554.  The filing hours are 8:00 a.m. to 7:00 p.m.  All hand deliveries must be held together with rubber bands or fasteners.  Any envelopes and boxes must be disposed of before entering the building.
   - Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9050 Junction Drive, Annapolis Junction, MD 20701.
   - U.S. Postal Service first-class, Express, and Priority mail must be addressed to 445 12th Street, SW, Washington, DC 20554.

84.     *People with Disabilities*:  To request materials in accessible formats for people with disabilities (Braille, large print, electronic files, audio format), send an e-mail to fcc504@fcc.gov or call the Consumer & Governmental Affairs Bureau at 202-418-0530 (voice) or 202-418-0432 (TTY).

85.     *Ex Parte Rules.*  The proceeding this Further Notice initiates shall be treated as a "permit-but-disclose" proceeding in accordance with the Commission's *ex parte* rules.[216]  Persons making *ex parte* presentations must file a copy of any written presentation or a memorandum summarizing any oral presentation within two business days after the presentation (unless a different deadline applicable to the Sunshine period applies).  Persons making oral *ex parte* presentations are reminded that memoranda summarizing the presentation must (1) list all persons attending or otherwise participating in the meeting at which the *ex parte* presentation was made, and (2) summarize all data presented and arguments made during the presentation.  If the presentation consisted in whole or in part of the presentation of data or arguments already reflected in the presenter's written comments, memoranda or other filings in the proceeding, the presenter may provide citations to such data or arguments in his or her prior comments, memoranda, or other filings (specifying the relevant page and/or paragraph numbers where such data or arguments can be found) in lieu of summarizing them in the memorandum.  Documents shown or given to Commission staff during *ex parte* meetings are deemed to be written *ex parte* presentations and must be filed consistent with section 1.1206(b).  In proceedings governed by section 1.49(f) or for which the Commission has made available a method of electronic filing, written *ex parte* presentations and memoranda summarizing oral *ex parte* presentations, and all attachments thereto, must be filed through the electronic comment filing system available for that proceeding, and must be filed in their native format (e.g., .doc, .xml, .ppt, searchable .pdf).  Participants in this proceeding should familiarize themselves with the Commission's *ex parte* rules.

---

[214] 47 CFR §§ 1.415, 1.419.

[215] *See* FCC, Electronic Filing of Documents in Rulemaking Proceedings, 63 Fed. Reg. 24121 (May 1, 1998).

[216] 47 CFR § 1.1200 *et seq.*

## VI.    ORDERING CLAUSES

86.    Accordingly, IT IS ORDERED that, pursuant to sections 1, 2, 225, and 251 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 152, 225, 251, the foregoing Report and Order and Further Notice of Proposed Rulemaking, ARE ADOPTED, and the Commission's rules are hereby AMENDED as set forth in Appendix B.

87.    IT IS FURTHER ORDERED that this Report and Order SHALL BE EFFECTIVE 30 days after publication of a summary in the Federal Register, except that the amendments to sections 64.611, 64.613, and 64.615, which contain new or modified information collection requirements, SHALL BE EFFECTIVE on the date specified in a notice published in the *Federal Register* announcing Office of Management and Budget approval of the information requirements of such rules pursuant to the Paperwork Reduction Act.

88.    IT IS FURTHER ORDERED that the Commission SHALL SEND a copy of the Report and Order and Further Notice of Proposed Rulemaking, in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act, 5 U.S.C. § 801(a)(1)(A).

89.    IT IS FURTHER ORDERED that the Commission's Consumer and Governmental Affairs Bureau, Reference Information Center, SHALL SEND a copy of the Report and Order and Further Notice of Proposed Rulemaking, including the Final Regulatory Flexibility Analysis and the Initial Regulatory Flexibility Analysis, to the Chief Counsel for Advocacy of the Small Business Administration.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

### APPENDIX A

### List of Commenting Parties

**Comments:**

ASL Services Holdings, LLC dba GlobalVRS (GlobalVRS)

Communications Service for the Deaf, Inc. (CSD)

Convo Communications, LLC (Convo)

ZVRS Holding Company, the parent of CSDVRS, LLC d/b/a ZVRS and Purple Communications, Inc. (collectively, ZVRS)

Sorenson Communications, LLC (Sorenson)

Registry of Interpreters for the Deaf, Inc. (RID)

Telecommunications for the Deaf and Hard of Hearing, Inc., National Association of the Deaf, California Coalition of Agencies Serving the Deaf and Hard of Hearing, Deaf and Hard of Hearing Consumer Advocacy Network, Cerebral Palsy and Deaf Organization, and Deaf Seniors of America, (collectively, Consumer Groups)


**Reply Comments:**

Consumer Groups

GlobalVRS

RID

Sorenson

ZVRS

## APPENDIX B

### Final Rules

## Part 64 - MISCELLANEOUS RULES RELATING TO COMMON CARRIERS

1. The authority citation for part 64 continues to read as follows:

Authority: 47 U.S.C. 154, 201, 202, 217, 218, 220, 222, 225, 226, 227, 228, 251(a), 251(e), 254(k), 262, 403(b)(2)(B), (c), 616, 620, and 1401-1473, unless otherwise noted.

2. Amend § 64.601 by redesignating paragraphs (a)(13)-(27) and (a)(28)-(47) as (a)(15)-(29) and (a)(32)-(51) and adding paragraphs (a)(13)-(14) and (a)(30)-(31) to read as follows:

### § 64.601 Definitions and provisions of general applicability.

(a) * * *

(13) *Direct video customer support*.  A telephone customer support operation that enables callers with hearing or speech disabilities to engage in real-time direct video communication in ASL with ASL speakers in a call center operation.

(14) *Enterprise videophone*.  A videophone maintained by a business, organization, government agency, or other entity, and designated for use by its employees or other individuals in private or restricted areas.

* * * * *

(30) *Public videophone*.  A videophone maintained by a business, organization, government agency, or other entity, and made available for use by the public in a public space, such as a public area of a business, school, hospital, library, airport, or government building.

(31) *Qualified direct video entity*.  An individual or entity that is approved by the Commission for access to the TRS Numbering Directory that is engaged in direct video customer support and that is the end-user customer that has been assigned a telephone number used for direct video customer support calls or is the designee of such entity.

* * * * *

3. Amend § 64.604 by revising paragraphs (c)(5)(iii)(D), (c)(8), and (c)(12) to read as follows:

### § 64.604 Mandatory Minimum Standards

* * * * *

(c) * * *

(5) * * *

(iii) * * *

(D) * * *

(*2*) *Call data required from all TRS providers*.  In addition to the data requested by paragraph (c)(5)(iii)(D)(*1*) of this section, TRS providers seeking compensation from the TRS Fund shall submit the following specific data associated with each TRS call for which compensation is sought:

* * * * *

(*3*) *Additional call data required from Internet-based Relay Providers*.  In addition to the data required by paragraph (c)(5)(iii)(D)(*2*) of this section, Internet-based Relay Providers seeking compensation from the Fund shall submit speed of answer compliance data.

(*4*) Providers submitting call record and speed of answer data in compliance with paragraphs (c)(5)(iii)(D)(*2*) and (c)(5)(iii)(D)(*3*) of this section shall:

40

(*i*) Employ an automated record keeping system to capture such data required pursuant to paragraph (c)(5)(iii)(D)(*2*) of this section for each TRS call for which minutes are submitted to the fund administrator for compensation; and

* * * * *

(8) *Incentives for use of IP CTS and VRS.*

(i) * * *

(v) A VRS provider shall not offer or provide to any person or entity any form of direct or indirect incentives, financial or otherwise, for the purpose of encouraging individuals to register for or use the VRS provider's service.

(vi) Any IP CTS or VRS provider that does not comply with this paragraph (c)(8) shall be ineligible for compensation for such service from the TRS Fund.

* * * * *

(12) *Discrimination and preferences.*  A VRS provider shall not:

(i) * * *

(ii) * * *

(iii) Subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

* * * * *

4. Amend § 64.611 by adding paragraph (a)(6) and revising paragraph (c) to read as follows:

**§ 64.611 Internet-based TRS registration.**

(a) * * *

(6) *Enterprise and public videophones.*

(i) *Definition.*  For purposes of this section, a default VRS provider for an enterprise or public videophone is the VRS provider that assigns a North American Numbering Plan (NANP) telephone number to such videophone or receives a port of such number.

(ii) *Enterprise and public videophone certification.*

(A) A default VRS provider for an enterprise or public videophone shall obtain a written certification from the individual responsible for the videophone, attesting that the individual understands the functions of the videophone and that the cost of VRS calls made on the videophone is financed by the federally regulated Interstate TRS Fund, and for enterprise videophones, that the organization, business, or agency will make reasonable efforts to ensure that only persons with a hearing or speech disability are permitted to use the phone for VRS.

(B) The certification required by paragraph (a)(6)(ii)(A) of this section must be made on a form separate from any other agreement or form, and must include a separate signature specific to the certification.  For the purposes of this rule, an electronic signature, defined by the Electronic Signatures in Global and National Commerce Act, as an electronic sound, symbol, or process, attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record, has the same legal effect as a written signature.  For the purposes of this rule, an electronic record, defined by the Electronic Signatures in Global and National Commerce Act as a contract or other record created, generated, sent, communicated, received, or stored by electronic means, constitutes a record.

(C) *Consent for transmission and confidentiality of enterprise and public videophone registration.*  A default VRS provider for an enterprise or public videophone must obtain consent from the individual

responsible for the videophone to transmit the information required by this section to the TRS User Registration Database.  Before obtaining such consent, a VRS provider must describe to such individual, using clear, easily understood language, the specific information being transmitted, that the information is being transmitted to the TRS User Registration Database to ensure proper administration of the TRS program, and that failure to provide consent will result in denial of service to the videophone.  A VRS provider must obtain and keep a record of affirmative acknowledgment of such consent for every enterprise and public videophone.  A VRS provider shall maintain the confidentiality of any registration and certification information obtained by the provider, and may not disclose such registration and certification information, or the content of such registration and certification information, except as required by law or regulation.

(iii) *Enterprise and Public videophone registration*.  A default VRS provider for an enterprise or public videophone shall transmit to the TRS User Registration Database, in a format prescribed by the administrator of the TRS User Registration Database, the following information for each enterprise or public videophone for which it assigns (or receives a port of) a North American Numbering Plan telephone number or for which it is the default VRS provider:

(A) The default VRS provider's name;

(B) The NANP telephone number assigned to the videophone;

(C) The name and physical address of the organization, business, or agency where the enterprise or public videophone is located, and the Registered Location of the phone if that is different from the physical address;

(D) Whether the videophone is a public or enterprise videophone, and for enterprise videophones, the type of location where the videophone is located within the organization, business, agency, or other entity, such as, but not limited to, a reception desk or other work area, a private workspace, a private room in a long-term care facility, or another restricted area;

(E) The date of initiation of service to the videophone by the default VRS provider;

(F) The name of the individual responsible for the videophone, confirmation that the provider has obtained the certification required by paragraph (a)(6)(ii) of this section, and the date the certification was obtained by the provider; and

(G) whether the device is assigned to a hearing individual who knows sign language.

(iv) Default VRS providers shall transmit the information required by paragraph (a)(6)(iii) of this section for existing enterprise and public videophones within 120 days after notice from the Commission that the TRS User Registration Database is ready to accept such information.  For videophones placed in service more than 120 days after such notice, the default VRS provider shall submit the required information and certification before initiating service.  VRS calls placed to or from enterprise or public videophones more than 120 days after such notice shall not be compensable if the required registration information was not received by the TRS User Registration Database before placement of the call.

(v) VRS providers shall notify the TRS Fund administrator within one business day in the event that a registered enterprise or public videophone is removed or permanently disconnected from VRS.

* * * * *

(c) * * *

(1) * * *

(i) Obtain current routing information from their Registered Internet-based TRS Users, registered enterprise and public videophones, and hearing point-to-point video users;

* * * * *

42

(2) * * *

(i) Take such steps as are necessary to cease acquiring routing information from any VRS, IP Relay, or hearing point-to-point video user, or any individual responsible for maintaining an enterprise or public videophone, that ports a NANP telephone number to another VRS or IP Relay provider or otherwise selects a new default provider; and

(ii) * * *

(B) VRS and IP Relay providers other than the default provider are aware that they must query the TRS Numbering Directory in order to obtain accurate routing information for a particular user of VRS or IP Relay, or for an enterprise or public videophone.

* * * * *

5. Amend § 64.613 by revising paragraphs (a)(1), (a)(2), and (a)(4), and adding paragraphs (a)(5) and (c) to read as follows:

**§ 64.613 Numbering directory for Internet-based TRS users.**

(a) *TRS Numbering Directory*.

(1) The TRS Numbering Directory shall contain records mapping the geographically appropriate NANP telephone number of each Registered Internet-based TRS User, registered enterprise videophone, registered public videophone, direct video customer support center, and hearing point-to-point video user to a unique Uniform Resource Identifier (URI).

(2) For each record associated with a geographically appropriate NANP telephone number for a registered VRS user, enterprise videophone, public videophone, direct video customer support center, or hearing point-to-point video user, the URI shall contain a server domain name or the IP address of the user's device. For each record associated with an IP Relay user's geographically appropriate NANP telephone number, the URI shall contain the user's user name and domain name that can be subsequently resolved to reach the user.

* * * * *

(4) Only the TRS Numbering Administrator, Internet-based TRS providers, and Qualified Direct Video Entities may access the TRS Numbering Directory.

(5) VRS providers shall route all calls placed to NANP numbers entered in the TRS Numbering Directory in accordance with the associated routing information, except that a call placed by a registered VRS user to a NANP number that is capable of receiving either voice or video calls may be handled and routed as a VRS call if the caller affirmatively so requests.

* * * * *

(c) *Direct Video Customer Support*.

(1) *Registration*. Any person seeking to access the TRS Numbering Directory as a Qualified Direct Video Entity shall submit an application to the Commission addressed to the Federal Communications Commission, Chief, Consumer and Governmental Affairs Bureau and captioned "Direct Video Numbering Directory Access Application." The application shall include:

(i) The applicant's name, address, telephone number, and email address;

(ii) A description of the service to be provided;

(iii) An acknowledgment that the authorization granted under this paragraph is subject to compliance with applicable Commission rules;

(iv) Contact information for personnel responsible for addressing issues relating to such compliance; and

(v) Certification that the applicant's description of service meets the definition of direct video customer support and that the information provided is accurate and complete.

(2) *Commission Authorization.* The Commission shall approve an application for a Qualified Direct Video Entity to have access to the TRS Numbering Directory if the applicant demonstrates, through its responses to each of the above requests for information and any additional information requested by the Commission, that the applicant has a legitimate need for such access and is aware of its regulatory obligations.

(3) *Termination of Authorization.* Authorization to access the TRS Numbering Directory shall terminate:

(i) If a Qualified Direct Video Entity relinquishes its authorization by notifying the Commission;

(ii) Automatically if one year elapses with no call-routing queries received regarding any of the Qualified Direct Video Entity's NANP telephone numbers; or

(iii) If the Commission determines, after notice to the entity and an opportunity for the entity to contest the proposed termination, that the entity is no longer qualified as described in its application, has materially misrepresented information to the Commission, the TRS Numbering administrator, or the TRS User Registration Database administrator, has failed to provide required information in the format requested, or has violated an applicable Commission rule or order or a requirement imposed by authority of the TRS Numbering administrator or the TRS User Registration Database administrator. Following the termination of an authorization, the TRS Numbering administrator shall remove the previously authorized entity's telephone numbers from the TRS Numbering Directory.

(4) *Notification of Material Change.* A Qualified Direct Video Entity that is granted access to the TRS Numbering Directory shall notify the Commission within 60 days of any material changes to information provided in its application.

(5) *Qualified Direct Video Entities' Obligations.* A Qualified Direct Video Entity shall comply with all relevant rules and obligations applicable to VRS providers' access to the TRS Numbering Directory and the use of numbers provisioned in the TRS Numbering Directory, including, but not limited to:

(i) Provisioning and maintaining current routing information in the TRS Numbering Directory for each NANP telephone number that it enters in such directory;

(ii) Being able to make point-to-point calls and receive point-to-point or VRS calls from any VRS user in accordance with all interoperability standards applicable to VRS providers, including, but not limited to, the relevant technical standards specified in § 64.621(b) of this part;

(iii) Protecting customer proprietary network information of any VRS user obtained in accordance with sections 64.5101-64.5111 of this title (TRS Customer Proprietary Network Information);

(iv) Following TRS Numbering Directory access procedures and performing related administrative functions as directed by the TRS Numbering administrator in consultation with the Managing Director and the Chief, Consumer and Governmental Affairs Bureau; and

(v) Adhering to all other applicable standards pertaining to privacy, security, and reliability.

(6) *Call transfer capability.* A Qualified Direct Video Entity shall ensure that each customer support center is able to initiate a call transfer that converts a point-to-point video call into a VRS call, in the event that a VRS user communicating with a direct video customer agent needs to be transferred to a hearing person while the call is in progress. No later than six months after the effective date of this paragraph (c), each VRS provider shall be capable of activating an effective call transfer procedure within 60 days after receiving a request to do so from a Qualified Direct Video Entity.

(7) *TRS User Registration Database.* For each direct video number to be entered into the TRS Numbering Directory, unless otherwise instructed by the TRS User Registration Database administrator, a Qualified Direct Video Entity must create an equivalent entry in the TRS User Registration Database by

providing:

(i) The Qualified Direct Video Entity's name;

(ii) The date that the Qualified Direct Video Entity was approved for TRS Numbering Directory access;

(iii) The name of the end-user customer support center (if different from the Qualified Direct Video Entity);

(iv) Contact information for the end-user customer support call center(s); and

(v) Other information reasonably requested by the TRS User Registration Database administrator.

6. Amend § 64.615 by redesignating paragraphs (a)(2)-(5) as (a)(3)-(6), revising paragraphs (a)(1) and (a)(6), and adding paragraph (a)(2) to read as follows:

**§ 64.615 TRS User Registration Database and administrator.**

(a) * * *

(1) VRS providers shall validate the eligibility of the party on the video side of each call by querying the TRS User Registration Database or the TRS Numbering Directory, as directed by the Commission, the TRS Fund administrator, or the TRS Numbering Administrator on a per-call basis.  Emergency 911 calls are excepted from this requirement.

* * * * *

(2) *Enterprise and public videophone call validation.*

(i) VRS providers shall validate the registration of an enterprise or public videophone used for a VRS call by querying the designated database in accordance with paragraph (a)(1) of this section.

(ii) [Reserved]

(iii) VRS providers shall require their CAs to terminate any call which does not include a registered enterprise or public videophone or, pursuant to the provider's policies, the call does not appear to be a legitimate VRS call, and VRS providers may not seek compensation for such calls from the TRS Fund.

(iv) Emergency 911 calls from enterprise and public videophones shall be exempt from the videophone validation requirements of paragraph (a)(2)(i) of this section.

* * * * *

(6) *User verification.*

(i) The TRS User Registration Database shall have the capability of performing an identification verification check when a VRS provider, IP CTS provider, or other party submits a query to the database about an existing or potential user or an enterprise or public videophone.

(ii) VRS and IP CTS providers shall not register individuals or enterprise or public videophones that do not pass the identification verification check conducted through the TRS User Registration Database.

(iii) VRS providers shall not seek compensation for calls placed by individuals or for calls placed to or from enterprise or public videophones that do not pass the identification verification check conducted through the TRS User Registration Database.

* * * * *

**APPENDIX C**

**Proposed Rules**

The Federal Communications Commission proposes to amend Title 47 of the Code of Federal Regulations as follows:

**Part 64 - MISCELLANEOUS RULES RELATING TO COMMON CARRIERS**

1.  The authority citation for part 64 continues to read as follows:

**Authority**: 47 U.S.C. 154, 201, 202, 217 218, 220, 222, 225, 226, 227, 228, 251(a), 251(e), 254(k), 262, 403(b)(2)(B), (c), 616, 620, and 1471-1473, unless otherwise noted.

2.  Amend § 64.604 by revising paragraph (c)(5)(iii)(D) to read as follows:

(D) * * *

(*1*) TRS providers seeking compensation from the TRS Fund shall provide the administrator with true and adequate data, and other historical, projected and state rate related information reasonably requested to determine the TRS Fund revenue requirements and payments. TRS providers shall provide the administrator with the following: total TRS minutes of use, total interstate TRS minutes of use, <u>total operating expenses and</u> total TRS investment in general in accordance with part 32 of this chapter, and other historical or projected information reasonably requested by the administrator for purposes of computing payments and revenue requirements.

3.  Amend section 64.611 by revising paragraphs (a)(4) and (a)(6)(ii)(A) and adding new paragraphs (a)(6)(vi)-(viii) to read as follows:

**§ 64.611 Internet-based TRS registration.**

(a) * * *

(4) *TRS User Registration Database information for VRS.*

(i) *Registration information.*  Prior to requesting compensation from the TRS Fund for service provided to a consumer, a VRS provider shall obtain the consumer's:

<u>(A) Full name;</u>

<u>(B) Date of birth;</u>

<u>(C) Full residential address;</u>

<u>(D) Telephone number; and</u>

<u>(E) Last four digits of the consumer's Social Security number or Tribal identification number.</u>

<u>(ii) *Registration submission.*</u>  Each VRS provider shall collect and transmit to the TRS User Registration Database, in a format prescribed by the administrator of the TRS User Registration Database, the following information for each of its new and existing registered Internet-based TRS users: full name; <u>full residential</u> address; ten-digit telephone number assigned in the TRS numbering directory; last four digits of the social security number or Tribal Identification number, if the registered Internet-based TRS user is a member of a Tribal nation and does not have a social security number; date of birth; Registered Location; VRS provider name and dates of service initiation and termination; a digital copy of the user's self-certification of eligibility for VRS and the date obtained by the provider; the date on which the user's identification was verified; and (for existing users only) the date on which the registered Internet-based TRS user last placed a point-to-point or relay call.

<u>(iii)</u> Each VRS provider must obtain, from each new and existing registered Internet-based TRS user, consent to transmit the registered Internet-based TRS user's information to the TRS User Registration Database. Prior to obtaining consent, the VRS provider must describe to the registered Internet-based

TRS user, using clear, easily understood language, the specific information being transmitted, that the information is being transmitted to the TRS User Registration Database to ensure proper administration of the TRS program, and that failure to provide consent will result in the registered Internet-based TRS user being denied service. VRS providers must obtain and keep a record of affirmative acknowledgment by every registered Internet-based TRS user of such consent.

(iv) VRS providers must, for existing registered Internet-based TRS users, submit the information in paragraph (a)(3) of this section to the TRS User Registration Database within 60 days of notice from the Commission that the TRS User Registration Database is ready to accept such information. Calls from or to existing registered Internet-based TRS users that have not had their information populated in the TRS User Registration Database within 60 days of notice from the Commission that the TRS User Registration Database is ready to accept such information shall not be compensable.

(v) VRS providers must submit the information in paragraph (a)(4) of this section upon initiation of service for users registered after 60 days of notice from the Commission that the TRS User Registration Database is ready to accept such information.

* * * * *

(6) * * *

(ii) * * *

(A) A default VRS provider for an enterprise or public videophone shall obtain a written certification from the individual responsible for the videophone, attesting that the individual understands the functions of the videophone and that the cost of VRS calls made on the videophone is financed by the federally regulated Interstate TRS Fund, and for enterprise videophones, that the organization, business, or agency will make reasonable efforts to ensure that ~~only persons with a hearing or speech disability~~ registered VRS users are permitted to use the phone for VRS.

* * * * *

(vi) Beginning 180 days after notice from the Commission that the TRS User Registration Database and TRS Numbering Directory are ready to process log-in information from enterprise and public videophones, VRS calls at such videophones shall not be compensable from the TRS Fund unless the videophone has been registered in accordance with this section, the videophone user is a registered VRS user, and the videophone user has logged into the videophone.

(vii) Only one user may be logged into an enterprise or public videophone at any time, except that, for an enterprise videophone located at a reception desk or other work area, up to five users may be logged in simultaneously, provided that the phone is configured so that each user must select his or her individual user profile before answering or placing a call.  Providers shall keep records of users that are pre-authorized under this paragraph and shall discontinue permission for such automatic use by any individual that the provider knows or has reason to believe no longer needs access to the device.

(viii) Emergency 911 calls from enterprise and public videophones and calls from public videophones installed in emergency shelters shall be exempt from the videophone user log in requirements of paragraph (a)(6)(vi) of this section.

* * * * *

4. Amend § 64.615 by revising paragraphs (a)(2) to read as follows:

**§ 64.615 TRS User Registration Database and administrator.**

(a) * * *

(2) * * *

(i) VRS providers shall validate the eligibility of a party using an enterprise or public videophone by querying the designated database in accordance with paragraph (a)(1) of this section.

(ii) <u>VRS providers shall transmit with such queries any log-in information specified in the database administrator's instructions for validating such calls.</u>

(iii) VRS providers shall require their CAs to terminate any call which does not include <u>an individual eligible to use VRS</u> or, pursuant to the provider's policies, the call does not appear to be a legitimate VRS call, and VRS providers may not seek compensation for such calls from the TRS Fund.

(iv) Emergency 911 calls from enterprise and public videophones shall be exempt from the videophone validation requirements of paragraph (a)(2)(i) of this section.

(v) Emergency 911 calls from enterprise and public videophones <u>and calls from public videophones installed in emergency shelters</u> shall be exempt from the videophone <u>user log-in</u> requirements of paragraph (a)(2) of this section.

* * * * *

**APPENDIX D**

**FINAL REGULATORY FLEXIBILITY ANALYSIS**

1.    As required by the Regulatory Flexibility Act of 1980 (RFA),[1] as amended, the Commission incorporated an Initial Regulatory Flexibility Analysis (IRFA) into the Further Notices of Proposed Rulemaking.[2]  The Commission sought written public comment on the proposals in the *2017 VRS Improvements FNPRM*, including comment on the IRFA.[3]  No comments were received in response to the IRFA.  This Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[4]  A copy of the Report and Order, and FRFA (or summaries thereof) will also be published in the Federal Register.[5]

A.    **Need For, and Objectives of, the Rules**

2.    With regard to enterprise and public videophones, the Report and Order adopts a requirement for video relay service (VRS) providers to:  (1) submit registration information to the telecommunications relay service user registration database (TRS-URD) administrator for each enterprise or public videophone after notice from the Commission that the TRS-URD is ready to accept such information; (2) notify the TRS Fund administrator in the event a registered enterprise or public videophone is removed from service or permanently disconnected from VRS, within one business day of such termination; and (3) monitor videophone usage and report any unusual activity to the TRS Fund administrator.  These safeguards will help protect against waste, fraud, and abuse to the TRS program by ensuring that only eligible individuals use enterprise and public videophones to place VRS calls.

3.    The Report and Order also (1) replaces the current requirement for VRS providers, when validating the eligibility of the party on the video side of each VRS call, to query the TRS-URD, with a requirement to query either the TRS-URD or the TRS Numbering Directory, as directed by the Commission, the TRS Fund administrator or the TRS Numbering Administrator; (2) allows qualified entities to access the TRS Numbering Directory in order to enable direct video calling (direct video) by registered VRS users to customer support call centers; and (3) prohibits VRS providers from offering or providing any form of direct or indirect incentives for the purpose of encouraging consumers to register for or use VRS.  These rule changes are intended to improve VRS and further the statutory goals of functional equivalency, encouraging the use of existing technology, and not discouraging the development of new technology, while seeking to prevent and protect against waste fraud and abuse.

B.    **Summary of Significant Issues Raised by Public Comments in Response to the IRFA**

4.    No comments were filed in response to the IRFA.

C.    **Response to Comments by the Chief Counsel for Advocacy of the Small Business Administration**

5.    Pursuant to the Small Business Jobs Act of 2010, which amended the RFA, the Commission is required to respond to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration (SBA), and to provide a detailed statement of any change made to the

---

[1] *See* 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. §§ 601-612, has been amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *Structure and Practices of the Video Relay Service Program*; *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket Nos. 10-51 and 03-123, Report and Order, Notice of Inquiry, Further Notice of Proposed Rulemaking, and Order, 32 FCC Rcd 2436, 2509-12, App. E. (2017) (*2017 VRS Improvements FNPRM*).

[3] *2017 VRS Improvements FNPRM*, 32 FCC Rcd at 2489, 2509-12, para. 140, App. E.

[4] *See* 5 U.S.C. § 604.

[5] *See id*. § 604(b).

proposed rules as a result of those comments.[6]  The Chief Counsel did not file any comments in response to the proposed rules in this proceeding.

> **D.** **Description and Estimate of the Number of Small Entities to which the Rules will Apply**

6.      The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the rule changes.[7]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[8]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[9]  A "small business concern" is one that: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[10]

7.      The rules adopted in the Report and Order will affect obligations of VRS providers and providers of direct video services.  These services can be included within the broad economic category of All Other Telecommunications.  There are currently five providers that have received a certification to provide VRS and receive compensation from the TRS Fund for providing VRS:  ASL Services Holdings, LLC d/b/a GlobalVRS, Convo Communications, LLC, CSDVRS, LLC d/b/a ZVRS, Purple Communications, Inc.,[11] and Sorenson Communications, Inc.

8.      *All Other Telecommunications*.  "All Other Telecommunications" is defined as follows: This U.S. industry is comprised of establishments that are primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation.  This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems. Establishments providing Internet services or Voice over Internet Protocol (VoIP) services via client-supplied telecommunications connections are also included in this industry.[12]  The SBA has developed a small business size standard for "All Other Telecommunications," which consists of all such firms with gross annual receipts of $32.5 million or less.[13]  For this category, census data for 2012 show that there were 1,442 firms that operated for the entire year.  Of these firms, a total of 1,400 had gross annual

---

[6] 5 U.S.C. § 604(a)(3).

[7] *Id*. § 603(b)(3).

[8] *Id*. § 601(6).

[9] *Id*. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  The statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."  *Id*.

[10] 15 U.S.C. § 632.

[11] CSDVRS, LLC d/b/a ZVRS and Purple Communications, Inc. are wholly owned subsidiaries of the ZVRS Holding Company. The two companies are in the process of merging, but currently each subsidiary independently provides VRS and receives compensation from the TRS Fund for providing VRS.  *See Purple Communications, Inc. et al.*, Order and Consent Decree, 32 FCC Rcd 1608, 1615, para. 9 (2017) (allowing Purple and ZVRS to offer VRS under their existing brands for no more than 3 years).

[12] http://www.census.gov/cgi-bin/ssssd/naics/naicsrch.

[13] 13 CFR § 121.201; NAICS Code 517919.

receipts of less than $25 million.[14]  Thus, a majority of "All Other Telecommunications" firms potentially affected by the rules adopted can be considered small.

       **E.**     **Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements**

       9.       The rule prohibiting VRS providers from offering or providing incentives to register for or use VRS does not create direct reporting and recordkeeping requirements, but does impose compliance requirements on VRS providers.  Specifically, this rule requires VRS providers to refrain from offering or providing incentives to encourage consumers to register for or use VRS.

       10.     The rules affecting enterprise and public videophones will require VRS providers to collect and retain identifying information for the videophones for which they are the default VRS provider and to provide that information to the TRS-URD administrator, including the name of the default VRS provider, the name and physical address of the organization, business, or agency where the videophone is located, the date that service to the videophone is initiated, the name of the individual associated with the organization, business, or agency who is responsible for maintaining the videophone, and confirmation that the provider has obtained a signed certification from that individual stating that such person understands the function of the videophones and that the cost of VRS calls is financed by the federally regulated Interstate TRS Fund, and for enterprise phones that the person certifying will make reasonable efforts to ensure that only eligible users make use of the videophones.  VRS providers are also required to monitor usage of enterprise and public videophones and report unusual activity to the TRS Fund administrator.

       11.     The rules require VRS providers, when validating the eligibility of the party on the video side of each VRS call, to query either the TRS-URD or the TRS Numbering Directory, as directed by the Commission, the TRS Fund administrator or the TRS Numbering Administrator, rather than requiring that only the TRS-URD may be queried.

       12.     Qualified Direct Video Entities seeking access to the TRS Numbering database are required to submit an application that includes: (1) the applicant's name, address, telephone number, and email address; (2) a description of the service to be provided; (3) an acknowledgment that the authorization granted under this paragraph is subject to compliance with applicable Commission rules; (4) contact information for personnel responsible for addressing issues relating to such compliance; and (5) certification that the applicant possesses the financial, managerial, and technical expertise to provide reliable service.  To enter a telephone number into the TRS Numbering Directory, Qualified Direct Video Entities will be required to submit the telephone number, associated call routing information, and registration information in accordance with instructions provided by the TRS-URD administrator.  The Qualified Direct Video Entity must provide to the TRS-URD administrator the Qualified Direct Video Entity's name; the date that the Qualified Direct Video Entity was approved for numbering access; the name of the end-user customer support center (if different from the Qualified Direct Video Entity); the physical address of the customer support center or centers that will receive calls placed to the direct video number and other information reasonably requested by the TRS-URD administrator.

       **F.**     **Steps Taken to Minimize Significant Impact on Small Entities, and Significant Alternatives Considered**

       13.     The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others):  (1) the establishment of differing compliance or reporting requirements or timetables that take into account

---

[14]

http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2012_US_51SSSZ4&prodType=table.

the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[15]

14.    The provision of VRS to enterprise and public videophones is optional for VRS providers.  The registration requirements for such videophones apply equally to all VRS providers and users, and are necessary to prevent waste, fraud, and abuse of the TRS Fund by making it possible for the TRS Fund administrator to monitor call data records for unusual call patterns.  The registration requirements for enterprise and public videophones are no more burdensome than the registration requirements for individual videophones.  To the extent there are differences in operating costs resulting from economies of scale, those costs are reflected in the different rate structures applicable to large and small VRS providers.[16]

15.    The rule requiring VRS providers, when validating the eligibility of the party on the video side of each VRS call, to query either the TRS-URD or the TRS Numbering Directory, as directed by the Commission, the TRS Fund administrator, or the TRS Numbering Administrator, rather than requiring that only the TRS-URD may be queried, as the rules are currently written, is not burdensome.  This change does not alter the basic requirement to query a database; its only effect is to possibly change the database that providers must query.

16.    Permitting Qualified Direct Video Entities to access the TRS Numbering Directory is necessary for the purpose of routing calls to and from such customer support call centers.  Granting access will subject Qualified Direct Video Entities to call-routing, application, and registration rules that are similar to and no more burdensome than those currently applicable to VRS providers.  The application and registration requirements apply only to those entities that seek to place numbers in the TRS Numbering Directory and are necessary to ensure that such entities are aware of and capable of meeting their regulatory obligations and have a legitimate need to access the TRS Numbering database.

17.    Prohibiting VRS providers from offering or providing direct or indirect inducements to register for or use VRS will help ensure that VRS is available to the extent possible and in the most efficient manner while helping to limit waste, fraud, and abuse by preventing VRS providers from encouraging users to make calls that the users might otherwise not make.  Adopting this prohibition may benefit small VRS providers by removing competitive costs associated with offering inducements unrelated to providing service and focusing competition on service quality.

### G.    Report to Congress

18.    The Commission will send a copy of the Report and Order, including this FRFA, in a report to be sent to Congress and the Government Accountability Office pursuant to the Congressional Review Act.[17]  In addition, the Commission will send a copy of the Report and Order, including this FRFA, to the Chief Counsel for Advocacy of the Small Business Administration.

---

[15] 5 U.S.C. § 603(b).

[16] To account for the vast differences in the per-minute costs of VRS providers, the Commission adopted a tiered compensation rate structure such that as the number of the provider's monthly minutes increases, the additional minutes are compensated at lower per-minute rates.  *Structure and Practices of the Video Relay Service Program*; *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket Nos. 10-51 and 03-123, Report and Order and Order, 32 FCC Rcd 5891, 5907, para. 31 (2017).

[17] *See* 5 U.S.C. § 801(a)(1)(A).

H.    **Federal Rules Which Duplicate, Overlap, or Conflict With, the Commission's Proposals**

19.    None.

**APPENDIX E**

**Initial Regulatory Flexibility Analysis**

1.      As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[1] the Commission has prepared this Initial Regulatory Flexibility Analysis (IRFA) of the possible significant economic impact on a substantial number of small entities by the policies and rules proposed in the Further Notice of Proposed Rulemaking (FNPRM).  Written public comments are requested on this IRFA.  Comments must be identified as responses to the IRFA and must be filed by the deadline for comments on the FNPRM provided in the item.  The Commission will send a copy of the entire FNPRM, including this IRFA, to the Chief Counsel for Advocacy of the Small Business Administration (SBA).[2]  In addition, the FNPRM and the IRFA (or summaries thereof) will be published in the Federal Register.[3]

**A.      Need For, and Objectives of, the Proposed Rules**

2.      The FNPRM proposes to (1) permit communications assistants (CAs) to handle video relay service (VRS) calls at home on a permanent basis; (2) allow VRS providers to provide service to new and ported users at their own risk for up to two weeks while the telecommunications relay service (TRS) user registration database (Database) administrator is verifying the user's registration information; and (3) implement log-in procedures to authenticate users prior to their use of enterprise and public videophones.  If adopted, these proposals would improve video communications for people with disabilities, while safeguarding the VRS program against waste, fraud, and abuse by ensuring that only eligible individuals use enterprise and public videophones to place VRS calls.

**B.      Legal Basis**

3.      The authority for this proposed rulemaking is contained in sections 1, and 225 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 151, 225.

**C.      Description and Estimate of the Number of Small Entities Impacted**

4.      The RFA directs agencies to provide a description of, and where feasible, an estimate of the number of small entities that may be affected by the proposed rules and policies, if adopted.[4]  The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[5]  In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[6]  A "small business concern" is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[7]

---

[1] *See* 5 U.S.C. § 603.  The RFA, *see* 5 U.S.C. §§601-612, was amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA), Pub. L. No. 104-121, Title II, 110 Stat. 857 (1996).

[2] *See* 5 U.S.C. § 603(a).

[3] *See id.*

[4] 5 U.S.C. § 603(b)(3).

[5] *Id*. § 601(6).

[6] *Id*. § 601(3) (incorporating by reference the definition of "small-business concern" in the Small Business Act, 15 U.S.C. § 632).  Pursuant to 5 U.S.C. § 601(3), the statutory definition of a small business applies "unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register."

[7] 15 U.S.C. § 632.

5.      The rules proposed in the FNPRM will affect obligations of VRS providers.  These services can be included within the broad economic category of All Other Telecommunications.  There are currently five providers that have received a certification to provide VRS and receive compensation from the TRS Fund for providing VRS:  ASL Services Holdings, LLC d/b/a GlobalVRS, Convo Communications, LLC, CSDVRS, LLC d/b/a ZVRS, Purple Communications, Inc.,[8] and Sorenson Communications, Inc.

6.      *All Other Telecommunications*.  "All Other Telecommunications" is defined as follows: This U.S. industry is comprised of establishments that are primarily engaged in providing specialized telecommunications services, such as satellite tracking, communications telemetry, and radar station operation.  This industry also includes establishments primarily engaged in providing satellite terminal stations and associated facilities connected with one or more terrestrial systems and capable of transmitting telecommunications to, and receiving telecommunications from, satellite systems. Establishments providing Internet services or VoIP services via client-supplied telecommunications connections are also included in this industry.[9]  The SBA has developed a small business size standard for "All Other Telecommunications," which consists of all such firms with gross annual receipts of $32.5 million or less.[10]  For this category, census data for 2012 show that there were 1,442 firms that operated for the entire year.  Of these firms, a total of 1,400 had gross annual receipts of less than $25 million.[11] Thus, a majority of "All Other Telecommunications" firms potentially affected by the rules adopted can be considered small.

**D.      Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements**

7.      The proposals to permit CAs to handle VRS calls at home on a permanent basis and to allow VRS providers to provide service to new and ported users for up to two weeks while the Database administrator is verifying the user's registration information do not create any new reporting, recordkeeping, or other compliance requirements on VRS providers beyond what is already required.  The rules requiring users to log in when using enterprise and public videophones will require VRS providers to collect and retain log-in information from users.

**E.      Steps Taken to Minimize Significant Impact on Small Entities, and Significant Alternatives Considered**

8.      The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others):  (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather

---

[8] CSDVRS, LLC d/b/a ZVRS and Purple Communications, Inc. are wholly owned subsidiaries of the ZVRS Holding Company. The two companies are in the process of merging, but currently each independently provides VRS and receives compensation from the TRS Fund for providing VRS.  *See Purple Communications, Inc. et al.*, Order and Consent Decree, 32 FCC Rcd 1608, 1615, para. 9 (2017) (allowing Purple and ZVRS to offer VRS under their existing brands for no more than 3 years).

[9] http://www.census.gov/cgi-bin/ssssd/naics/naicsrch.

[10] 13 CFR § 121.201; NAICS Code 517919.

[11] http://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ECN_2012_US_51SSSZ4&prodType=table.

than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[12]

9.      The proposal to permit CAs to handle VRS calls at home would make the current pilot program permanent, and participation in the program would continue to be optional for VRS providers. The Commission is not proposing any new requirements that would increase regulatory requirements beyond those that are already required as part of the pilot program. The existing and proposed requirements would apply equally to all VRS providers and are necessary to prevent waste, fraud, and abuse of the TRS Fund by ensuring that CAs are subject to proper supervision and accountability. To the extent there are differences in operating costs resulting from economies of scale, those costs are reflected in the different rate structures applicable to large and small VRS providers.[13]

10.      The proposal to allow VRS providers to provide service to new and ported users for up to two weeks while the Database administrator is verifying the user's registration information would simply provide a new option for VRS providers. The Commission is not proposing any new requirements that would increase regulatory requirements beyond those that are already required. The existing and proposed requirements would apply equally to all VRS providers and are necessary to prevent waste, fraud, and abuse of the TRS Fund by ensuring that providers are not compensated for service provided to users who do not satisfy the verification requirements. To the extent there are differences in operating costs resulting from economies of scale, those costs are reflected in the different rate structures applicable to large and small VRS providers.

11.      The provision of VRS to enterprise and public videophones is optional for VRS providers. The proposed user log-in requirements for such videophones would apply equally to all VRS providers and users, and are necessary to prevent waste, fraud, and abuse of the TRS Fund by ensuring that only registered users can use such phones for VRS calls. The log-in requirements for enterprise and public videophones would be no more burdensome than user authentication procedures for pay phones and for any type of commercial activity such as on-line banking and bill paying and use of various other Internet services. To the extent there are differences in operating costs resulting from economies of scale, those costs are reflected in the different rate structures applicable to large and small VRS providers.

12.      The FNPRM seeks comment from all interested parties. Small entities are encouraged to bring to the Commission's attention any specific concerns they may have with the proposals outlined in the FNPRM. The Commission expects to consider the economic impact on small entities, as identified in comments filed in response to the FNPRM, in reaching its final conclusions and taking action in this proceeding.

### F.      Federal Rules Which Duplicate, Overlap, or Conflict With, the Commission's Proposals

13.      None.

---

[12] 5 U.S.C. § 603(b).

[13] To account for the vast differences in the per-minute costs of VRS providers, the Commission adopted a tiered compensation rate structure such that as the number of the provider's monthly minutes increases, the additional minutes are compensated at lower per-minute rates. *Structure and Practices of the Video Relay Service Program*; *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket Nos. 10-51 and 03-123, Report and Order and Order, 32 FCC Rcd 5891, 5907, para. 31 (2017).

## STATEMENT OF
## CHAIRMAN AJIT PAI

Re:     *Structure and Practices of the Video Relay Service Program*, CG Docket No. 10-51;
        *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing
        and Speech Disabilities*, CG Docket No. 03-123

In 2010, Apple changed the world of modern wireless communications when it introduced FaceTime.  But what's since become an enjoyable luxury for many of us—being able to see the person you're talking to on a screen—is a necessity for individuals who are deaf, hard of hearing, or otherwise speech-disabled.  For them, being able to communicate via sign language across a digital platform is a critical link to the outside world.

Today, the FCC is making that link stronger.  Specifically, we're improving direct, unmediated, and private video communications between sign language users and customer support call centers, which are the recipients of a large amount of video relay service (VRS) traffic.  By broadening the range of direct video customer support entities that may access the TRS Numbering Directory beyond those defined as "service providers," we will give those customer support call centers that choose to participate the opportunity to communicate more efficiently with their customers who rely on American Sign Language.  Qualified entities would access the TRS Numbering Directory according to the same rules and obligations that govern VRS providers.

In this Order, we are also taking common-sense steps to curtail the potential for waste, fraud, and abuse in the VRS program.  For example, we are prohibiting VRS providers from offering non-service-related inducements that are intended to entice consumers to sign up for or use a VRS provider's service.  Non-service-related giveaways don't improve service quality and may encourage unnecessary use of the service.

But even with these steps, our work at improving VRS is not fully done.  That's why we are proposing to make permanent the pilot program for at-home call handling, which allows VRS providers to handle some VRS calls from at-home workstations, subject to appropriate safeguards.  The pilot program enabled providers to attract and retain qualified interpreters for whom working at the companies' call centers is not a practical option, which in turn expanded the available pool of qualified sign-language interpreters who can improve VRS reliability.

Of course, all that we are seeking to accomplish in this item would not be possible without the excellent work of a number of people within the Commission.  A hearty thank you to the following: Bob Aldrich, Barbara Esbin, Eliot Greenwald, Michael Scott, and Karen Peltz Strauss (now retired) from the Consumer and Governmental Affairs Bureau; Andy Mulitz and David "Raster" Schmidt from the Office of Managing Director; Sharon Lee from the Enforcement Bureau; Terry Cavanaugh, Marcus Maher, Rick Mallen, and Bill Richardson from the Office of General Counsel; Eric Burger, Katherine LoPicca, Chuck Needy, and Emily Talaga from the Office of Economics and Analytics; and Belford Lawson from the Office of Communications Business Opportunities.

### STATEMENT OF
### COMMISSIONER MICHAEL O'RIELLY

Re:    *Structure and Practices of the Video Relay Service Program*, CG Docket No. 10-51;
       *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing
       and Speech Disabilities*, CG Docket No. 03-123

This item makes various improvements to the Commission's video relay service program (VRS) and contains good ideas. For example, I support the adoption of new rules to prohibit VRS providers from offering non-service related inducements to increase subscriptions. We must do everything we can to protect the investments of ratepayers and ensure that the telecommunications relay service (TRS) fund remains sustainable. That requires eliminating wasteful practices that artificially drive up minutes and drain the fund without commensurate benefits for subscribers.

While we're on the topic of sustainability, I also believe we need to think more broadly about how our TRS programs are addressing the *actual* needs of the deaf and hard of hearing community. As I explained to the Disability Advisory Committee last month, we need to face the reality that voice has become just another "app" and is declining in significance; directing scarce resources to ensure access to a relic of the past does not necessarily accomplish the objective of providing "functionally equivalent" service. While a shift away from voice service may not be suitable for all TRS program participants, we must consider how free and low-cost apps and technologies can better accommodate certain segments of the deaf and hard of hearing population. Given substantial fund growth in recent years, this is necessary to ensure the programs' sustained viability.

I look forward to examining the record in response to the item's Further Notice and vote to approve.

**STATEMENT OF**
**COMMISSIONER BRENDAN CARR**

Re:     *Structure and Practices of the Video Relay Service Program*, CG Docket No. 10-51;
        *Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing*
        *and Speech Disabilities*, CG Docket No. 03-123

Last week, I had the chance to meet Betsy, a speech pathologist whose organization helps children with disabilities communicate through the use of technology.  She told me about a young girl named Mia.  Mia is entirely nonverbal, meaning she can't say words or communicate with any sounds.  Yet technology has given her a voice.  Mia has a smartphone with an application that can speak for her with the push of a button.  Thanks to this technology, Mia has been able to participate at school and tell her parents "I love you"—things that were not possible for her to do previously.

Mia's story is a reminder that one of the most important roles technology plays is in bridging the communication divide for those with disabilities.  And as technology advances, we are seeing more and more private sector innovations that help individuals with hearing, speech, or visual impairments communicate with the world around them.

At the FCC, we need to support that trend.  One way we do that is through the Commission's TRS Fund, which subsidizes the cost of VRS—a service that allows people with hearing or speech disabilities to make phone calls over a broadband-enabled videophone.  VRS helps ensure that Americans with hearing or speech impairments do not lose out on the connectivity essential to talking with friends and family, calling for help in an emergency, or accessing job opportunities.

Given the significant role VRS plays in the hearing loss community, it is incumbent on us to ensure the program is available for those who need it.  So I am glad we are taking steps today to increase accountability in the program, but also to make it more accessible for everyone who benefits from it.

Thank you to the staff of the Consumer and Governmental Affairs Bureau for your work on the item.  It has my support, and I look forward to seeing the record we receive on the Further Notice.

**STATEMENT OF**
**COMMISSIONER JESSICA ROSENWORCEL**

Re:    *Structure and Practices of the Video Relay Service Program*, CG Docket No. 10-51;
*Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*; CG Docket No. 03-123

Under the Americans with Disabilities Act, functional equivalency has been the foundation of our telecommunications relay service policies.  Functional equivalency may sound like the kind of regulatory lingo that only a lawyer could love.  But for millions of Americans with hearing and speech impairments, it means that they have the right and ability to pick up the phone, reach out and connect, and participate more fully in the world.

Our Video Relay Service program, which allows individuals who are deaf and hard-of-hearing to communicate using the phone system in a conversational way, plays a vital role in providing functional equivalency.  But with the march of time comes changes in technology.  So in order to keep our VRS policies current and honor the spirit and substance of functional equivalency we need to make adjustments.  This rulemaking seeks to do just that by making changes that will hopefully allow for greater access to VRS.  It also asks questions to inform the agency's future work about in-home interpreting and ways to speed service to new consumers or those that change providers.  I support this order and rulemaking and I appreciate my colleagues' willingness to work with me to make modifications I requested to ensure public and enterprise videophones are more accessible to persons with hearing and speech disabilities.

Of course, this rulemaking is not the only work that lies ahead.  We also have to address an outstanding petition that seeks clarity from this agency surrounding how telecommunications relay service fees are presented on consumer bills.  As this agency considers this request, I hope that it carefully considers the duties and obligations that arise under the Americans with Disabilities Act, including the cherished principle of non-discrimination.  On that score, it will be important to consider the words of the National Council on Disability, which has warned the requested relief is "antithetical to the purpose of the ADA."

Thank you to the Consumer and Governmental Affairs Bureau and Disability Rights Office for your work on today's order and rulemaking and your efforts to expand access to communications every day.

**STATEMENT OF
COMMISSIONER GEOFFREY STARKS**

Re:    *Structure and Practices of the Video Relay Service Program*, CG Docket No. 10-51;
*Telecommunications Relay Services and Speech-to-Speech Services for Individuals with Hearing and Speech Disabilities*, CG Docket No. 03-123

Of all our responsibilities here at the Commission, Section 225 of the Act stands out.  Congress has tasked this agency with ensuring the provision of services so that persons who are deaf, hard of hearing, deaf-blind, or have speech disabilities can communicate in a manner that is functionally equivalent to persons without such disabilities.  Our task is to make sure that all of the tools, conveniences, and opportunities that flow from effortless connectivity can be fully enjoyed by all of our friends and neighbors.  Touching base with a doctor, getting help in an emergency, catching up with loved ones—and living independently, it is our job to make sure that important moments are not missed due to inaccessible systems and services.

Advances in technology help—video chat, translation and interpretation services, and other relatively new tools have brought us all closer to our goal of functional equivalence.  But the Commission needs to keep its eye on the ball to make sure that we are doing our part to allow these technological advances to truly benefit everyone.

I support today's item.  It advances direct video calling services, which better allow those with disabilities to have a natural, one-on-one conversation with somebody without requiring the assistance of a third party.  It moves us a step closer to allowing communications assistants, the interpreters that fuel VRS services, to provide service from home without having to live close to a call center.  Our pilot program on this point demonstrated that this is a win-win scenario—providing good jobs for more interpreters and allowing service providers to attract and retain high quality professionals.

The item also addresses public and enterprise videophones, so that these devices are more fully integrated into the program.  I am pleased with edits made to the public draft to lessen burdens on entities that would maintain these videophones.  We shouldn't risk having these devices removed from campuses, hospitals, and businesses simply because our requirements are too intrusive or burdensome.

All in all, this item advances our responsibilities under Section 225 and improves our VRS services for users.  I support it and thank the Disability Rights Office and their colleagues in the Consumer and Governmental Affairs Bureau for their work on this item.